Erwin L. RUPERT, Clergyman, Native American Church of the U.S.A., Plaintiff, Appellant,

v.

DIRECTOR, UNITED STATES FISH AND WILDLIFE SERVICE, Defendant, Appellee.

No. 91–1861.

United States Court of Appeals, First Circuit.

Submitted Nov. 27, 1991.

Decided Feb. 19, 1992.

Erwin L. Rupert on brief pro se.

Barry M. Hartman, Acting Asst. Atty. Gen., Jacques B. Gelin, Peter Van Tuyn, Katherine W. Hazard, Attys., Dept. of Justice, Environment and Natural Resources Div., Michael Mason, Office of Sol., U.S. Dept. of the Interior, and Robin Lepore, Office of Regional Sol., U.S. Dept. of the Interior, on brief for defendant, appellee.

Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.

PER CURIAM.

The question in this appeal is whether the federal government can, without violating the Establishment Clause of the First Amendment, (a) prohibit the possession of eagle feathers, but (b) allow members of Native American tribes to use eagle feathers for religious purposes, and (c) refuse to extend that exemption to people who are not Native Americans but who also seek to use eagle feathers for religious purposes. We hold that, under these circumstances, the government can craft an exemption that is limited to Native Americans because such an exemption serves two important governmental goals.

The Bald Eagle Protection Act, 16 U.S.C. § 668 *et seq.*, prohibits the possession of bald eagles and golden eagles, or of any parts of those eagles, such as their feathers. 16 U.S.C. § 668a, however, creates an exemption to the general prohibition; it authorizes the Secretary of the Interior to give permits for the possession of eagles or eagle feathers for, among other things, "the religious purposes of Indian tribes," whenever such possession is "compatible with the preservation of the bald eagle or the golden eagle." The Secretary has issued regulations that describe the criteria for obtaining a permit. They require that the applicant be "an Indian who is authorized to participate in *bona fide* tribal religious ceremonies." 50 C.F.R. § 22.22.

The appellant, Erwin L. Rupert, is the pastor of an "all-race" church which follows Native American religious customs, including the ceremonial use of eagle feathers. (The government does not, at least for purposes of this appeal, dispute the sincerity of Mr. Rupert's beliefs.) Mr. Rupert has also organized a "tribe" called the "Tribe of the Pahana," which means the tribe of "returned white brothers and sisters." It is clear, however, that Mr. Rupert does not descend from Native Americans and is not a member of any officially recognized Native American tribe. *See* 25 C.F.R. § 83.7 (in order to obtain recognition as an "Indian tribe," group must show that it "has been identified from historical times until the present on a substantially continuous basis, as 'American Indian', or 'aboriginal' ").

Mr. Rupert applied to the United States Fish and Wildlife Service for a permit to use eagle feathers. He asked the Service either to recognize his Tribe of Pahana as an "Indian tribe" within the meaning of

Section 668a, or to grant him dispensation from the requirement that applicants for a permit be members of Native American tribes. The Service refused to grant his application, but passed it on to the Bureau of Indian Affairs as the agency best capable of deciding whether the Tribe of Pahana deserved recognition as a *bona fide* tribe. The Bureau refused to recognize Mr. Rupert's group as a tribe because it did "not consist of Native American Indian descendants who are descended from a specific historical tribe...."

Mr. Rupert then sued the Director of the Fish and Wildlife Service. He claimed that Section 668a, as the Director had construed it, violated the Establishment Clause of the First Amendment, which commands that Congress shall make "no law ... respecting an establishment of religion...." The magistrate-judge before whom the parties consented to proceed granted summary judgment to the defendant, and this appeal followed.

Mr. Rupert does not challenge the government's power to ban the use of eagle feathers for *all* purposes, including religious ceremonies. *See Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (generally applicable, neutral criminal prohibition does not violate Free Exercise Clause even if it proscribes conduct that litigant's religion prescribes). But, he contends, once the government decides to create an exemption for religious purposes, it must do so even-handedly. An exemption for all who use eagle feathers for religious purposes would not be an impermissible establishment of religion, *see Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1797, 10 L.Ed.2d 965 (1963) (general religious exemption "reflects nothing more than the governmental obligation of neutrality in the face of religious differences"), but an exemption that frees one religious group from the prohibition but leaves another bound by it offends the principle of neutrality that is at the core of the Establishment Clause. *See Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

■ Although Mr. Rupert's claim is rooted in the Establishment Clause, "[n]eutrality in its application requires an equal protection mode of analysis." *Walz v. Tax Comm. of City of New York,* 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring). *See also* Greenawalt, *Religion as a Concept in Constitutional Law,* 72 Cal.L.Rev. 753, 797 (1984) (equal protection principles "overarch" the tests of the religion clauses). And, in fact, a number of federal appellate courts, including this court, have used an equal protection analysis to scrutinize exemptions from the drug laws that give some Native Americans the right to use peyote for religious purposes. *See Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210, 1216–17 (5th Cir.1991); *Olsen v. Drug Enforcement Administration,* 878 F.2d 1458, 1463 n. 5 (D.C.Cir. 1989) ("in cases of this character, establishment clause and equal protection analyses converge"); *United States v. Rush,* 738 F.2d 497, 513 (1st Cir.1984). *See also Kennedy v. Bureau of Narcotics & Dangerous Drugs,* 459 F.2d 415, 416–17 (9th Cir.1972) (using a Fifth Amendment "substantive due process" analysis).

■ Laws that grant "denominational" preferences are generally subject to "strict scrutiny," under which the preference "must be invalidated unless it is justified by a compelling governmental interest ... and unless it is closely fitted to further that interest.... *Larson v. Valente,* 456 U.S. at 247, 102 S.Ct. at 1685. However, the matter is complicated here by the fact that the preference at issue is directed toward Native Americans. Native Americans have "unique legal status under federal law," and Congress has "plenary power ... based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). In a series of equal protection cases involving laws attacked as

treating Native Americans in ways that created *racial* classifications, the Supreme Court has "repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when *rationally related* to the Government's 'unique obligation toward the Indians.'" *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61 L.Ed.2d 823 (1979) (emphasis added and citation omitted). *See also United States v. Antelope,* 430 U.S. 641, 645–46, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977) (upholding federal jurisdiction over crimes committed by Native Americans on reservations); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 479–81, 96 S.Ct. 1634, 1644–45, 48 L.Ed.2d 96 (1976) (striking down state's attempt to tax property and sales on reservation); *Morton v. Mancari,* 417 U.S. at 554, 94 S.Ct. at 2484–85 (upholding statute and regulation that gave preference to Native Americans in hiring and promotions at Bureau of Indian Affairs).

▮ The principles affirmed in these cases "point ... broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications", *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977), and we therefore see no reason not to use the "rational relationship" analysis here, where the government has treated Native Americans differently from others in a manner that arguably creates a *religious* classification. As we observed in *United States v. Rush,* such special treatment (in that case, an exemption from the drug laws for religious use of peyote by members of the Native American Church) also finds its source in Congress' historical obligation to respect Native American sovereignty and to protect Native American culture, and "is uniquely supported by the legislative history and congressional findings underlying the American Indian Religious Freedom Act [42 U.S.C. § 1996], which declares a federal policy of 'protect[ing] and preserv[ing] for American Indians their inherent right of freedom to

believe, express and exercise the[ir] traditional religions ..., including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.'" 738 F.2d at 513. *See also Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d at 1217 ("unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation of church and state ordinarily required by the First Amendment"); *United States v. Warner,* 595 F.Supp. 595, 600 (D.N.D.1984) (peyote exemption valid given "governmental duty to preserve Indian culture and religion"). *But see Olsen v. Drug Enforcement Administration,* 878 F.2d at 1469 (Buckley, J., dissenting) (exemption for Native American religious use of peyote not grounded in unique political status of Native Americans but in their special culture and religion, in which respect Native Americans cannot be treated differently from others similarly situated without violating Establishment Clause).

There is no question that the exemption at issue here is "rationally related" to legitimate governmental interests. In crafting Section 668a's religious-use exemption from the Bald Eagle Protection Act (which otherwise abrogated Native American treaty and aboriginal rights to hunt eagles), "Congress ... considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception that delineated the extent to which Indians would be permitted to hunt the bald and golden eagle." *United States v. Dion,* 476 U.S. 734, 743–44, 106 S.Ct. 2216, 2222, 90 L.Ed.2d 767 (1986). The exemption, therefore, does not merely *serve* the government's interests in (1) protecting Native American religion and culture and (2) protecting a dwindling and precious eagle population; it sets those interests in equipoise. Any diminution of the exemption would adversely affect the former interest, but any extension of it would adversely affect the latter. In equal protection terms, the "fit" between classifica-

tion and legislative purpose is snug; indeed, given the nature of the governmental interests at stake and the close fit between the exemption and those interests, we would be hard put to say that the exemption could not survive even "strict scrutiny."

*Affirmed.*