# Permissible Accommodation of Sacred Sites

The Establishment Clause of the First Amendment does not bar either an Executive Order that requires the accommodation of ceremonial use of sites on federal land that are sacred to federally recognized Indian tribes or a National Park Service regulation, designed to implement that Order, that prohibits the issuance of commercial climbing licenses at one such site during a period of religious significance.

September 18, 1996

MEMORANDUM OPINION FOR THE SECRETARY OF THE INTERIOR

We have been asked to provide our views on the obligations imposed by the Establishment Clause on the treatment of sacred sites under Executive Order No. 13007. That Order states that each federal agency with responsibility for the management of federal lands "shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites." Exec. Order No. 13007, 61 Fed. Reg. 26,771 (1996). The executive order defines "Indian tribe" to mean "an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to Public Law No. 103–454, 108 Stat. 4791, and 'Indian' refers to a member of such an Indian tribe." *Id.*

Questions concerning the permissible means for implementing this executive order have arisen in the wake of a recent federal district court decision enjoining a National Park Service regulation that prohibited the issuance of commercial climbing licenses at Devils Tower, a sacred site in Wyoming, during the religiously significant month of June. [1] We believe that this case was wrongly decided and that the federal government has broad latitude to accommodate the use of sacred sites by federally recognized Indian tribes. [2]

In the first section of this memorandum, we lay out the general principles that govern the accommodation of religion under the Establishment Clause. In the second section, we address the principles applicable to the accommodation of sacred sites. We then apply those principles to the Devils Tower case.

---

[1] *See Bear Lodge Multiple Use Ass'n v. Babbitt,* No. 96–CV–063–D (D. Wyo. Jun. 8, 1996).*

* Editor's Note: Following both the district court's grant of the preliminary injunction in the cited decision and the issuance of this opinion, the Secretary of the Interior revoked the commercial climbing ban at Devils Tower in December 1996. The district court thereafter dismissed as moot the plaintiffs' request, based on a theory that the ban violated the Establishment Clause, for permanent injunctive relief. *See Bear Lodge Multiple Use Ass'n v. Babbitt,* 2 F. Supp.2d 1448, 1451 (D. Wyo. 1998), aff'd, 175 F.3d 814 (10th Cir. 1999).

[2] It is our understanding that Executive Order No. 13007 only requires accommodations for federally recognized tribes.

331

## I. BACKGROUND

The Supreme Court has held that the Establishment Clause generally prohibits the government from singling out religious organizations for special, preferred treatment, whether in the form of a direct benefit or an exemption from a government requirement. *See Board of Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, 696 (1994) (plurality opinion) (the government must "pursue a course of 'neutrality' toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents" (citation omitted)); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (same).[3] At the same time, however, the Court "'has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.'" *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144–45 (1987)).[4] The accommodation doctrine permits the government to single out religion for special treatment under certain circumstances, usually when a generally applicable regulation interferes with the exercise of religion.

Although the accommodation doctrine permits the government, at times, to single out religion for special treatment, in general it does not excuse the government from complying with traditional Establishment Clause principles in other respects. Those traditional principles are embodied in the familiar *Lemon* test. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).[5] Under *Lemon*, the government must demonstrate that a law implicating the Establishment Clause (1) has a "secular legislative purpose," (2) has "a principal or primary effect" that neither advances nor inhibits religion, and (3) does not foster excessive governmental entanglement with religion. Recent Supreme Court cases make clear that purported accommodations must have a "secular legislative purpose" — namely, to lift a special, government-imposed burden on religious exercise. Such a permissible purpose generally will, in addition, prevent the accommodation from having the impermissible effect of advancing religion over non-religion. If an accommodation passes these two tests, it will satisfy *Lemon* so long as it does not foster excessive government entanglement with religion.

Importantly for present purposes, however, even where accommodations satisfy the *Lemon* test, the Establishment Clause still might be implicated where the accommodation is for the benefit of some denominations and not others; indeed,

---

[3] The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const amend. I.

[4] The Free Exercise Clause sometimes requires the government to accommodate religious exercise. This memorandum concerns principles that allow the government to provide religion with special treatment when not mandated by the Free Exercise Clause.

[5] In recent cases, the Supreme Court has moved away from rigid application of the *Lemon* framework. *See e.g., Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995); *Kiryas Joel*, 512 U.S. 687. At the same time, however, the Court has continued to apply the principles articulated in *Lemon*, where relevant. Because the Court has not announced a new test, we also use the *Lemon* principles to organize our analysis, and we supplement those principles where appropriate.

government actions that discriminate among religions typically are subject to strict scrutiny. *See Larson v. Valente*, 456 U.S. 228, 246 (1982).

## A. *Permissible Secular Purpose*

Under *Lemon*, laws and government practices that benefit religion must serve a "secular legislative purpose." 403 U.S. at 612. There is no requirement, however, that a law's purpose be unrelated to religion. As the Supreme Court has said, "that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted." *Amos*, 483 U.S. at 335 (internal quotations and citation omitted). But the government may not act "with the intent of promoting a particular point of view in religious matters." *Id.*

Although this is hardly a bright line, one application is certain: "Under the *Lemon* analysis, it is a permissible legislative purpose to *alleviate significant governmental interference* with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335 (emphasis added); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454 (1988) ("The Government's rights to the use of its own land . . . need not and should not discourage it from accommodating religious practices.")[6] As a general rule, however, the government may only lift a burden that *it* has imposed. The Supreme Court has repeatedly emphasized that the accommodation doctrine allows the protection of religious organizations from *governmental* interference.[7] In addi-

---

[6] In *Amos*, for example, the Supreme Court upheld an exemption for the secular, nonprofit activities of religious organizations from Title VII's prohibition on religious discrimination in employment. 483 U.S. at 327. Although a previous version of the statute already exempted such employers from the ban on religious discrimination with respect to their religious activities, the *Amos* Court reasoned that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious" and that such "[f]ear of potential liability might affect the way an organization carried out what it understood to be its religious mission." *Id.* at 336. Congress was entitled to lift this burden, the Court held.

In *Lyng*, the government adopted a plan permitting timber harvesting and road construction in an area of national forest that was traditionally used for religious purposes by members of three American Indian Tribes. After rejecting the tribes' argument that the Free Exercise Clause prohibited the government from establishing its plan, the Court, in dicta, encouraged the government to implement the plan in a manner that accommodated tribal religious practices. 485 U.S. at 454–55. This was true even though there was no assurance that other religions (or even other federally recognized tribes) would receive similar accommodations.

[7] In addition to *Amos* and *Lyng*, *see, e.g.*, *Kiryas Joel*, 512 U.S at 706 ("Prior decisions have allowed religious communities and institutions to pursue their own interests free from governmental interference."), *id.* at 705 ("[T]he Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice."), *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989) (plurality opinion) (exemption must "remov[e] a significant state-imposed deterrent to the free exercise of religion")

In *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), the Court invalidated a statutory exemption that alleviated a privately imposed burden on religious exercise. The Court reasoned that the statute, which required employers to excuse employees from working on their designated Sabbath, took "no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." *Id.* at 709. As a general matter, *Thornton* suggests the importance of weighing the interests of third parties when accommodating religious exercise. Although there is no explicit requirement that the government consider the effect of a religious accommodation on third parties, the Court has characterized exemptions that "burden[ ] non-beneficiaries markedly" as "unjusti-
Continued

tion, the government may only lift a burden that specially affects the *exercise* of religion, or religious activity. In the absence of a special burden on religious exercise, the government simply has nothing to accommodate.[8]

It is also clear that the Court at times will examine the purpose behind regulations that do not on their face refer to religion.[9] Thus, drafting a regulation without reference to religion will not necessarily shield it from Establishment Clause scrutiny. However, the Supreme Court has suggested in dicta that in the context of government zoning and land-use regulations, facially neutral accommodations of religion — that is, regulations that are designed to accommodate religion but that do so without explicitly referring to religion — are likely to withstand Establishment Clause review, even when designed to accommodate only one religious group.[10] Furthermore, the Court will not strike down a law (facially neutral or otherwise) on purpose grounds unless the law has no apparent secular purpose or its (impermissible) religious purpose predominates.[11]

## B. *Nonpreferential Effect*

Under *Lemon*, the primary effect of a government regulation cannot be to advance religion over non-religion. The Supreme Court has held, however, that when the government lifts a burden it has imposed on the exercise of religion, it does

---

fiable awards of assistance to religious organizations" rather than permissible accommodations. *Texas Monthly*, 489 U.S. at 15 (internal quotations omitted).

[8] The Court applied this logic in *Texas Monthly* to invalidate a state tax exemption for religious periodicals. Rejecting the state's argument that the Free Exercise Clause compelled the tax exemption, the plurality observed: "[T]he State has adduced no evidence that the payment of a sales tax by subscribers to religious periodicals . . . would offend their religious beliefs or inhibit religious activity. . . . No concrete need to accommodate religious activity has been shown." 489 U.S. at 18. Because the tax exemption singled out religious periodicals for a benefit and could not "reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion," the plurality found that it constituted an impermissible subsidy to religion. *Id.* at 15.

[9] *See Gillette v. United States*, 401 U.S. 437, 452 (1971) ("The question of government neutrality is not concluded by the observation that [a statute] on its face makes no discrimination among religions, for the Establishment Clause forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses."). In *McGowan v. Maryland*, 366 U.S. 420 (1961), for example, the Court examined the purpose behind the state's Sunday Closing laws, even though those laws merely prohibited commercial activity on Sunday and made no reference to religion. The Court upheld the laws, despite their apparent religious purpose, because they advanced several important secular goals. *Id.* at 433–35.

[10] *See Lyng*, 485 U.S. at 453–54 ("Nothing in our opinion should be read to encourage governmental insensitivity to the religious needs of any citizen. The Government's rights to the use of its own land, for example, need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents."); *id.* at 454 (noting with approval the "many" ameliorative, facially neutral measures that the Forest Service planned — including building a road so as to avoid Indian sacred sites — and implicitly suggesting that such "solicitous" choices would not violate the Establishment Clause despite their obvious purpose to accommodate religious exercise). At the very least, the Establishment Clause is not seriously implicated by facially neutral zoning regulations that benefit religious as well as other "like" institutions. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982) ("[T]here can be little doubt about the power of a state to regulate the environment in the vicinity of schools, churches, hospitals, and the like by exercise of reasonable zoning laws."); *id.* at 123 ("There can be little doubt that [protecting spiritual, cultural, and educational centers from the 'hurly-burly' associated with liquor outlets] embraces valid secular legislative purposes" under *Lemon.*).

[11] *See Wallace v. Jaffree*, 472 U.S. 38, 56–60 (1985) (invalidating moment of silence statute where the record not only establishes a religious purpose but reveals no secular purpose); *Edwards v. Aguillard*, 482 U.S. 578, 590 (1987) (finding legislation invalid if backed by "preeminent religious purpose"); *id.* at 599 (Powell, J., concurring) (observing that "religious purpose must predominate" for legislation to be invalid).

not impermissibly advance religion. *See Amos*, 483 U.S. at 336–37. Although the government may thereby enable religion to better advance itself, such an effect does not automatically offend the Establishment Clause. *Id.* at 337. Furthermore, the Court has stated, where "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, [there is] no reason to require that the exemption comes packaged with benefits to secular entities." *Id.* at 338.

### C. *No Excessive Entanglement*

Finally, *Lemon* prohibits the government from accommodating religion in a manner that creates a risk of excessive governmental entanglement with religion. Under *Lemon*, impermissible entanglement may occur when the government intervenes in religious affairs or when religious organizations assume governmental functions. [12]

### D. *Nondiscrimination*

Even where religious accommodations satisfy all three *Lemon* prongs, they also must satisfy the "clearest command of the Establishment Clause": "that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. It follows that a discriminatory accommodation typically will be subject to strict scrutiny. *Id.* at 246. [13]

## II. ACCOMMODATION AT SACRED SITES

Although the accommodation doctrine generally permits the government to single out religion for special treatment in order to alleviate government-imposed burdens on religious exercise, it nonetheless ordinarily prohibits the government from enacting regulations that prefer one religion over others, that foster excessive

---

[12] For example, in *Larkin*, the Court invalidated a statute that granted religious bodies veto power over applications for liquor licenses. Despite the State's otherwise valid interest in protecting churches, schools, and like institutions from "the 'hurly-burly' associated with liquor outlets," 459 U.S. at 123, the Court found that the statute created an impermissible "fusion" of governmental and religious functions. *Id.* at 126. Similarly, in *Kiryas Joel*, the Court invalidated a statute creating a school district for the Satmar Hasidim in part because it "delegat[ed] the State's discretionary authority over public schools to a group defined by its character as a religious community." 512 U.S. at 696.

[13] In *Larson*, the Supreme Court invalidated a portion of Minnesota's charitable solicitation registration and reporting requirements that exempted only those religious organizations that received more than half of their funding from members or affiliated organizations. Applying strict scrutiny, the Court found that the exemption was not closely fitted to further the government's interest in protecting its citizens from abusive solicitation practices because there was no evidence that predominantly member-funded organizations committed such practices less frequently than organizations receiving the majority of their funding elsewhere. *Id.* at 244–46. More recently, in *Kiryas Joel*, the Supreme Court invalidated a statute creating a special school district only for the religious enclave of Satmar Hasidim. It reasoned, in part, that the statute violated the principle that "government should not prefer one religion to another, or religion to irreligion" because the benefit flowed only to a single sect and there was "no assurance that the next similarly situated group seeking a school district of its own will receive one." 512 U.S. at 703. Citing *Larson*, the Court concluded that, "whatever the limits of permissible legislative accommodations may be it is clear that neutrality as among religions must be honored." *Id.* at 706–07 (citations omitted).

entanglement with religion, or that lift privately imposed burdens. However, these general prohibitions do not apply to regulations that accommodate the religious practices of federally recognized Indian tribes.

## A.

In *Morton v. Mancari*, 417 U.S. 535 (1974), the Supreme Court held that preferences for federally recognized Indian tribes are subject to less exacting scrutiny under the Equal Protection Clause than racial or ethnic preferences because of the historical guardian-ward relationship between those tribes and the federal government. In upholding an employment preference for Indians contained in the Indian Reorganization Act, 25 U.S.C. §§ 461–494, the Court held that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress's unique obligation toward the Indians, such legislative judgments will not be disturbed." 417 U.S. at 555. Applying this standard, the Court found that the preference before it was "reasonable and rationally designed to further Indian self-government" and did not constitute racial discrimination. *Id.* In fact, according to the Court, the preference was not even racial in nature because it favored a quasi-sovereign or political group consisting of federally recognized Indian tribes, rather than a discrete racial group consisting of Native Americans. Id. at 554, 553 n.24.

Two Courts of Appeals have extended the logic of Morton to the Establishment Clause context. In *Rupert v. Director, U.S. Fish and Wildlife Serv.*, 957 F.2d 32 (1st Cir. 1992) (per curiam), the First Circuit upheld an exemption for federally recognized Indian tribes from the federal criminal prohibition on the possession of eagle feathers. Faced with the question of whether to apply the strict scrutiny standard of *Larson* or the rational basis test of *Morton*, the court concluded that the principles articulated in *Morton* govern "where the government has treated Native Americans differently from others in a manner that arguably creates a *religious* classification." *Id.* at 35. The court reasoned that such preferential treatment — as with the preferential treatment at issue in *Morton* — "finds its source in Congress's historical obligation to respect Native American sovereignty and to protect Native American culture." *Id.* The court also found that such treatment

> is uniquely supported [in this context] by the legislative history and congressional findings underlying the American Indian Religious Freedom Act [42 U.S.C. § 1996], which declares a federal policy of "protect[ing] and preserv[ing] for American Indians their inherent right of freedom to believe, express and exercise the[ir] traditional religions . . ., including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."

*Id.* at 35 (quoting *United States v. Rusk*, 738 F.2d 497, 513 (1st Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985)).

Similarly, in *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991), the Fifth Circuit upheld statutory exemptions for the Native American Church from federal and state laws prohibiting peyote possession. After construing the exemptions as political classifications rather than as religious classifications, the court stated:

> The unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation between church and state ordinarily required by the First Amendment. The federal government cannot at once fulfill its constitutional role as protector of tribal Native Americans and apply conventional separatist understandings of the establishment clause to that same relationship.

*Id.* at 1217.

Given the special trust relationship between the federal government and federally recognized Indian tribes that *Morton, Rupert,* and *Peyote Way* recognize, there is a strong argument that neither *Lemon* nor *Larson* should apply to accommodations of tribal religious practices or sacred sites, because such accommodations are not religious preferences in the usual sense of that term. Rather, they are political preferences conferred by the federal government on a quasi-sovereign in furtherance of the federal government's duty to promote tribal self-determination in all of its forms. The fact that the accommodated rituals might be viewed as religious in some sense (because of the way in which the distinction between church and state has been understood in traditional Establishment Clause jurisprudence) is not dispositive when the government benefits those rituals in order to promote tribal self-determination. Such accommodations are political ones under *Morton* because they are "reasonably designed to further the cause of Indian self-government." 417 U.S. at 554.

But, even if traditional Establishment Clause principles apply, they must be applied in a manner that takes account of the special considerations that underlie *Morton.* As *Morton* clearly states, the Constitution gives the federal government broad power in dealing with federally recognized tribes as quasi-sovereigns. The Establishment Clause cannot appropriately be read to diminish the government's ability to exercise this power, as would result from a direct application of standard Establishment Clause analysis in the context of tribal religious accommodations. Indeed, as the *Peyote Way* court suggested, such analysis is plainly incompatible with the federal government's duty toward the tribes.

The special relationship between the federal government and tribes — a relationship that envisions active assistance from the federal government — thus, at the very least, necessitates a modification of the usual Establishment Clause analysis

337

when evaluating accommodations of tribal religious practices and sacred sites. At a minimum, as *Morton* suggests and *Rupert* and *Peyote Way* hold, the federal government may, without triggering *Larson* strict scrutiny, single out federally recognized Indian tribes for special treatment that is not provided to other groups, if other Establishment Clause principles are satisfied. [14] Moreover, we think that the government may do more than simply lift a government-imposed burden on tribal religious practices, and may in addition alleviate burdens imposed by private parties. While the *Lemon* test ordinarily requires the government to lift a burden of its own making when accommodating religion to deter back-door attempts to benefit religion, the special relationship contemplates direct benefits for tribes. Furthermore, such accommodations arguably may include a degree of involvement with Indian tribes that exceeds the normal entanglement boundaries between government and religion. While the *Lemon* test typically forbids excessive government entanglement with religion, the special relationship between the government and the tribes entails a degree of government involvement in tribal religious practices. In short, the federal government has considerable discretion to enact accommodations on behalf of federally recognized tribes. [15]

We should not be understood to suggest that the government's discretion to accommodate tribal religious practices is unlimited, even under the broadest understanding of *Morton's* effect on Establishment Clause analysis. For example, the rationale of *Morton* would not permit the government to act with the impermissible purpose of diluting tribal religious practices or establishing a national Indian religion. We do not decide here the precise limits of our analysis. We believe, however, that *Morton* leaves the government with broad latitude to accommodate tribal religious practices.

---

[14] To the extent the Establishment Clause or any other provision of law prohibits the federal government from discriminating *between* similarly situated federally recognized tribes, we note that Executive Order No. 13007, which provides that federal agencies "shall, to the extent practicable . . . accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners," ensures that all such tribes will receive accommodations where possible, and we read that Order to intend that similarly situated federally recognized tribes shall be treated similarly. *Cf. Kiryas Joel,* 512 U.S. at 703 (invalidating statute creating school district for the Satmar Hasidim where there was "no assurance that the next similarly situated group seeking a school district of its own will receive one").

[15] Prior to *Rupert* and *Peyote Way,* this Office took a narrower view of the effect on Establishment Clause analysis of the special relationship between the federal government and federally recognized tribes. *See Peyote Exemption for Native American Church,* 5 Op. O.L.C. 403, 419–20 (1981) (concluding that special relationship does not affect Establishment Clause analysis). In that Opinion, we stated that the unique status of federally recognized tribes does not justify special treatment of tribal religious practices. Because the tribes' unique status derives from their political position as quasi-sovereign nations, we reasoned that it only extends to preferences that further tribal authority and self-governance, not tribal religious observance. We note that that Opinion was drafted without the benefit of *Rupert* or *Peyote Way* and substantial commentary arguing that tribal religious practices are integral to tribal self-governance. *See, e.g.,* Richard Herz, *Legal Protection for Indigenous Cultures: Sacred Sites and Communal Rights,* 79 Va. L. Rev. 691, 703–04 (1993); Michael J. Simpson, *Accommodating Indian Religions: The Proposed 1993 Amendment to the American Indian Religious Freedom Act,* 54 Mont. L. Rev. 19, 34 (1993); Jack F. Trope, *Protecting Native American Religious Freedom: The Legal, Historical, and Constitutional Basis for the Proposed Native American Free Exercise of Religion Act,* 20 N.Y.U. Rev. L. & Soc. Change 373, 393 (1993). In addition, we do not believe that *Morton's* holding is limited to legislation directly related to Indian self-government functions. The reasoning in *Morton* should apply as well to legislation that is rationally related to the furtherance of Congress's unique obligation toward federally recognized tribes. *See, e.g., Alaska Chapter v. Pierce,* 694 F.2d 1162, 1167 (9th Cir. 1982).

Although we believe that the *Lemon* test does not apply with full force to tribal religious accommodations, no court has had occasion to address this precise issue. *Rupert* and *Peyote Way* upheld laws that singled out tribes for special treatment, but those laws complied with *Lemon* in other respects. Because the law is unsettled in this area, we recommend that federal agencies comply with *Lemon* to the extent feasible in implementing Executive Order No. 13007. Thus, where possible, we would advise agencies to minimize the risk of governmental entanglement and to target government-imposed burdens on access to, or ceremonial use of, sacred sites. [16] If these hurdles are cleared, the only remaining obstacle will be a question of *Larson*-like differential treatment; and *Rupert* and *Peyote Way* have held (correctly, in our view) that, in light of *Morton*, such differential treatment is permissible when it is to the benefit of federally recognized tribes.

We also suggest that, where feasible, agencies adopt regulations that are facially neutral with respect to religion — i.e., that do not on their face give priority to any religious use of the sites. Although such neutral regulations would not be immune from traditional Establishment Clause scrutiny, they may engender fewer constitutional challenges. Furthermore, as noted above, the Supreme Court has suggested that in the context of government zoning and land-use regulations, such neutral accommodations of religion are likely to withstand Establishment Clause scrutiny.

## B.

For the reasons outlined above, we believe that the district court in *Bear Lodge* erred in declaring the National Park Service ("NPS") management plan unconstitutional. That plan provides, in relevant part: "commercial use licenses for June climbing guide activities will not be issued [by the NPS] for June 1996 and beyond." National Park Service, Final Climbing Plan Management Plan at 22 (Feb. 1995). A group of commercial climbers sought to enjoin the operation of this part of the plan as a violation of the Establishment Clause. The district court granted a preliminary injunction, characterizing the no-commercial-climbing rule as "affirmative action by the NPS to exclude a legitimate public use of the tower for the sole purpose of aiding or advancing some American Indians' religious practices." *Bear Lodge,* slip op. at 11. [17] Furthermore, the court found that the

---

[16] In *many* cases, it might be argued that the federal government imposed a burden on tribal religious practices when it occupied the land on which a sacred site is located. More often, it might suffice that the government's prior Indian regulations, as well as its prior zoning and land-use decisions — including those that permit private parties to make use of the land on which the site sits — created a burden on tribal religious exercise.

[17] The court relied on *Badoni v. Higginson,* 638 F.2d 172, 179 (10th Cir. 1980), *cert. denied,* 452 U.S. 954 (1981), in which the Tenth Circuit rejected a Free Exercise claim asserted by Indians seeking to completely exclude tourists from a national monument. We note that nothing in *Badoni* — which merely held that the federal government need not exclude tourists from the monument under the Free Exercise Clause — precluded the government from voluntarily accommodating the tribal religious exercise under the Establishment Clause. As the Supreme Court has observed, "[i]t is well established . . . that [t]he limits of permissible state accommodation to religion are by no means co-

Continued

339

restriction "coerce[d]" climbers to conform their conduct to the Indians' religious practices in a way that would entangle the government in regulating behavior. *Id.* [18]

The district court incorrectly analyzed the Devils Tower no-commercial-climbing rule. As discussed above, regulations that accommodate tribal religious practices generally are permissible under *Morton* and its progeny either because they are political (and not religious) preferences or because they are subject to a different, less restrictive test under the Establishment Clause.

Indeed, the rule in this case is perhaps the least problematic form of accommodation on our analysis because it satisfies traditional Establishment Clause principles in every respect, with the possible exception of one. For example, the no-commercial-climbing rule creates no risk of excessive entanglement because it does not involve the government in tribal affairs or vice versa. It merely regulates third parties (i.e., commercial climbers) — parties that have been long subject to NPS regulation and permitting authority. Furthermore, it does so in a manner that neither requires the government to conform climber conduct to tribal religious practices, nor requires the climbers to conform their own conduct to those practices, as the district court suggested. Far from entangling the government in monitoring climber conduct at the site, the rule simply forecloses commercial climbing activity for a limited period of time.

To the extent that the climbing ban lifts a burden imposed by NPS in permitting commercial climbing at the site in the first instance, it satisfies this aspect of the purpose prong of *Lemon*. It is true that the rule was designed, at least in part, to accommodate tribes and tribal religions and not other groups or religions. It achieves this purpose, however, without referring to tribal religious practices or singling out religious uses of Devils Tower for preferential treatment. Thus, in order for the rule to survive constitutional review, the government need rely upon *Morton* only insofar as that case makes clear that the government may act with the purpose of accommodating tribes without providing a comparable accommodation to other religions. We believe *Morton* easily supports this modest application and that the no-commercial-climbing rule therefore comports with the Establishment Clause. Although the district court reached the opposite conclusion, its decision has no binding precedential effect on other courts. [19]

CHRISTOPHER H. SCHROEDER
*Acting Assistant Attorney General*
*Office of Legal Counsel*

extensive with the noninterference mandated by the Free Exercise Clause." *Amos*, 483 U.S. at 334 (internal quotations omitted). Thus, "[t]here is ample room under the Establishment Clause for benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.* (internal quotations omitted).

[18] The court thus analogized the climbing ban to the tribes' request in *Badoni* that the government require tourists to act in a respectful and appreciative manner when visiting the site.

[19] The district court's decision is unpublished and was issued in the context of an expedited motion for preliminary injunction. Briefing on the merits has yet to commence.