**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

RAYMOND S. HARDMAN

        Defendant - Appellant,

-------------------

In the Matter of JOSELUIS SAENZ,

        Claimant - Appellee,

v.

DEPARTMENT OF THE INTERIOR,

        Defendant - Appellant.

-------------------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

SAMUEL RAY WILGUS, JR.,

        Defendant - Appellant.

No. 99-4210

No. 00-2166

No. 00-4015

--------------------

CHRISTIAN LEGAL SOCIETY, THE
NEW MEXICO CIVIL LIBERTIES
FOUNDATION, THE COMMISSION
ON SOCIAL ACTION OF
REFORMED JUDAISM, HOPI
TRIBE, and JICARILLA APACHE
NATION,

      Amici Curiae.

---

**ON REHEARING EN BANC FROM THE UNITED STATES
DISTRICT COURTS FOR THE DISTRICTS OF
NEW MEXICO AND UTAH
(D. Ct. Nos. 99-CR-166-B, 99-21-M & 2:99-CR-00047W)**

---

Cindy Barton-Coombs, Roosevelt, Utah, for Appellant Hardman.

Peter Schoenburg of Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Frye, LLP, Albuquerque, New Mexico (Justin Bogan, Eureka, California, with him on the brief), for Appellee Saenz.

Joseph F. Orifici, Salt Lake City, Utah, for Appellant Wilgus.

Kathryn E. Kovacs, Attorney, United States Department of Justice, Washington, D.C. (John Cruden, Acting Assistant Attorney General, Christopher B. Chaney, Assistant United States Attorney, Salt Lake City, Utah, Sasha Siemel, Assistant United States Attorney, Albuquerque, New Mexico, Andrew Mengen, Attorney, United States Department of Justice, Washington, D.C., E. Ann Peterson, Attorney, United States Department of Justice, Washington, D.C.; and William G. Myers, III, Solicitor, Benjamin C. Jesup, Attorney, Mary Anne Kenworthy, Attorney, Janet Spaulding, Attorney, Department of the Interior, Washington, D.C., with her on the brief), arguing as Appellee for the United States in case numbers 99-4210 and 00-4015, and arguing as Appellant for the Department of Interior in case number 00-2166.

Stuart J. Lark and Gregory S. Baylor, Center for Law and Religious Freedom, Christian Legal Society, submitted a brief for amicus Christian Legal Society, the New Mexico Civil Liberties Foundation, and the Commission on Social Action of Reformed Judaism.

Alfred T. McDonnell and Kevin T. Traskos, Arnold & Porter, Denver, Colorado, submitted a brief for amicus Hopi Tribe.

Stephen H. Greetham, Nordhaus, Haltom, Taylor, Taradash & Bladh, LLP, Albuquerque, New Mexico; Wayne H. Bladh and Susan G. Jordan, Nordhaus, Haltom, Taylor, Taradash, & Bladh, LLP, Santa Fe, New Mexico, submitted a brief for amicus Jicarilla Tribe.

———————

Before **TACHA,** Chief Judge, **McKAY, SEYMOUR, BALDOCK, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY,** and **HARTZ**, Circuit Judges.[*]

———————

**TACHA**, Chief Judge.[**]

———————

Appellants Raymond S. Hardman and Samuel Ray Wilgus, Jr. were convicted for unrelated counts of illegally possessing eagle feathers in violation of sections 703 and 668(a) of Title 16 of the United States Code, respectively. Appellee Joseluis Saenz had eagle feathers in his possession seized by the Bureau of Indian Affairs, but was not criminally prosecuted.[1] He made a motion pursuant

———————

[*] Judge O'Brien took no part in the consideration or decision of this case.

[**] The opinion is unanimous with respect to all but parts II.E.1.b and II.F. Judges **MURPHY** and **BRISCOE** do not join those portions of the opinion.

[1] Mr. Hardman and Mr. Wilgus are appellants, and Mr. Saenz is an

(continued...)

-3-

to Fed. R. Crim. P. 41(e) for the return of the feathers, and the district court granted the motion. The cases initially came to three separate panels of this court. Because of the conflicting panel outcomes and the factual and legal similarities among the cases, we simultaneously issued and vacated the panel opinions, and then sua sponte ordered that the cases be reheard en banc. United States v. Hardman, 260 F.3d 1199 (10th Cir. 2001); see United States v. Wiles, 102 F.3d 1043, 1047 n.*, 1056 (10th Cir. 1996) (hearing issue as an en banc court before release of the panel decisions). We exercise jurisdiction pursuant to 28 U.S.C. § 1291, hold that the Religious Freedom Restoration Act controls all three cases, REMAND to the district court with respect to Mr. Hardman and Mr. Wilgus, and AFFIRM with respect to Mr. Saenz.

## I. Background

A.     Hardman

Mr. Hardman has been a practitioner of a Native American religion for many years. Although Mr. Hardman is not of Native American descent, his ex-wife and two children are enrolled members of the S'Kallum Tribe, a federally recognized tribe located in Washington State. Mr. Hardman resides within the boundaries of the Uintah and Ouray Reservation in Neola, Utah.

---

[1](...continued)
appellee. For the sake of brevity we will refer to these three individuals collectively as "claimants."

-4-

In 1993, when Mr. Hardman was still married to and living with his ex-wife, his son's godfather died. Mr. Hardman transported the body to Arizona so that appropriate religious services could be performed. As a part of the religious cleansing ritual, a Hopi tribal religious leader gave Mr. Hardman a bundle of prayer feathers – which included golden eagle feathers – to be kept in the truck that he had used to transport the body. Mr. Hardman claims that the feathers "hold a special prayer for me, my family, and the automobile they were in." After returning to his home, Mr. Hardman contacted the Utah Division of Wildlife Resources in order to obtain a permit to possess the feathers. He was informed, however, that he would not be allowed to apply because he was not a member of a federally recognized tribe.

Several years later, after Mr. Hardman and his wife separated, Mr. Hardman's estranged wife informed Ute tribal officers that he possessed golden eagle feathers without a permit. On September 24, 1996, Ute tribal fish and game officer Cleveland Murray went to Mr. Hardman's home and demanded the surrender of the eagle feathers.[2] Under protest, Mr. Hardman surrendered the eagle feathers, which were hanging from the rear view mirror of his truck.

On March 10, 1997, Mr. Hardman was issued a federal violation notice for

---

[2] In addition to being a tribal officer, Officer Murray was a cross-commissioned federal conservation officer acting under the authority of the U.S. Bureau of Indian Affairs.

possessing golden eagle feathers without a permit in violation of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703. Mr. Hardman was not charged with a violation of the Bald and Golden Eagle Protection Act ("BGEPA"). On February 25, 1999, a bench trial was held before a magistrate judge. The court found Mr. Hardman guilty of violating the MBTA, sentenced him to pay a small fine, and placed him on two years' bench probation. Mr. Hardman appealed to the district court, which affirmed his conviction.

Mr. Hardman then appealed to this court. Mr. Hardman argued that he had been prosecuted in a selective and discriminatory manner that violated his equal protection rights, and that the citing officer was acting outside the scope of his authority when he demanded that Mr. Hardman surrender the eagle feathers. Mr. Hardman also argued that the regulations violated his free exercise rights and ran afoul of the Establishment Clause. In oral argument before the en banc court, however, he waived the Establishment Clause issue. While Mr. Hardman argued in his motion to dismiss before the magistrate judge that the regulations violated the Religious Freedom Restoration Act ("RFRA"), he did not argue this on appeal to the district court or to this court. A divided panel of this court affirmed his conviction.

B.   Wilgus

Like Mr. Hardman, Mr. Wilgus is not of Native American descent and is

not a member of any federally recognized tribe, although he practices a Native American religion.[3]  Mr. Wilgus resides in Layton, Utah.

In June 1998, a Utah Highway Patrol Officer pulled over a speeding Mazda pick-up truck in which Mr. Wilgus was a passenger.  After arresting the driver for driving on a suspended license, the officer searched the truck and discovered 137 bald and golden eagle feathers that belonged to Mr. Wilgus.[4]  Mr. Wilgus's wife later produced an additional four bald and golden eagle feathers.  Mr. Wilgus admits that he knowingly possessed all 141 eagle feathers and did not have a permit from the U.S. Fish and Wildlife Service authorizing possession of the feathers.

In February 1999, the Government charged Mr. Wilgus with two counts of possessing bald and golden eagle feathers without a permit in violation of the BGEPA, 16 U.S.C. § 668(a).  Mr. Wilgus entered a conditional plea of guilty, subject to resolution of his constitutional claims.  He received a small fine and twelve months' probation.  Mr. Wilgus then appealed to this court, citing the Free Exercise Clause and the Establishment Clause as grounds for appeal.  In oral argument before the en banc court, however, he waived the Establishment Clause

_____

[3] Mr. Wilgus claims that he is an adopted member of the Paiute Tribe of Utah.  Mr. Wilgus concedes, however, that Paiute tribal law does not recognize adopted non-Indians as members of the tribe.

[4] It appears that Mr. Wilgus received his feathers as gifts on a number of occasions from various Native Americans.

issue. While Mr. Wilgus raised RFRA in his motion to dismiss, the district court dismissed this claim in light of City of Boerne v. Flores, 521 U.S. 507, 519 (1997) (holding that RFRA was not a valid exercise of Congress's Enforcement Clause powers). He did not appeal this issue. A divided panel of this court affirmed his conviction.

C.    Saenz

Joseluis Saenz is a lineal descendant of the Chiricahua Apache. Chiricahua have been included as members of other, federally recognized Apache tribes, and there was once a Chiricahua Reservation. Since at least 1886, however, the Chiricahua have not been a federally recognized tribe.

Mr. Saenz follows the beliefs and traditions of the Chiricahua Apache religion. Eagle feathers are an integral part of his religious practices. In 1996, while New Mexico state officials were executing a search warrant at Mr. Saenz's home as part of an investigation unrelated to this case, the officers noticed items with eagle feathers hanging on the walls. Mr. Saenz had obtained these feathers as gifts in connection with various ceremonies. After contacting the U.S. Fish and Wildlife Service and determining that Mr. Saenz did not have a permit for the feathers, the officers seized the items and sent them to the Fish and Wildlife

Service office in Albuquerque.[5]  In March 1997, the government brought criminal

charges against Mr. Saenz under the BGEPA, 16 U.S.C. § 668(a), but the charges

were dismissed on the government's motion in July 1997.  After attempting to

retrieve his feathers through administrative proceedings,[6] Mr. Saenz filed a

motion in federal district court under Fed. R. Crim. P. 41(e) for the return of

property seized by a search warrant.   Mr. Saenz initially brought his claims under

the BGEPA and RFRA, the Free Exercise Clause, and the Equal Protection

Clause.  The government moved to have the 41(e) motion treated as a civil

complaint, but the district court denied the government's motion.  The district

court granted Mr. Saenz's motion and ordered the return of the feathers.  The

court did not consider the constitutional grounds, and based its decision entirely

upon the BGEPA and RFRA.  The United States appealed, arguing that the

district court's analysis under RFRA was erroneous.  The United States also

argued on appeal that the district court failed to give deference to the Secretary of

---

[5] The items seized included three eagle feathers, one staff with an eagle
foot and seven eagle feathers, one eagle feather with a beaded shaft, one shield
with horsehair and four eagle feathers, one fan with twelve eagle feathers, six
eagle feathers tied together with rawhide, one small dream catcher with four
generic bird "fluffies," one quiver and four arrows with one eagle feather and
twelve raptor feathers, one bustle with ninety-four eagle feathers and ten
"fluffies," and a framed print with one eagle feather.

[6] The United States admits that the only requirement for a permit that Mr.
Saenz cannot fulfill is the requirement that the applicant must be a member of a
federally recognized tribe.

the Interior's interpretation of the BGEPA's exception for "Indian tribes," as required by Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984).[7]  A panel of this court found for Mr. Saenz under RFRA, and affirmed.

We now consider the parties' arguments en banc.

## II.  Discussion

### A.    Standard of Review

We review questions of law de novo.  United States v. Smart, 278 F.3d 1168, 1172 (10th Cir. 2002). We review a district court's factual determinations for clear error.  United States v. Callarman, 273 F.3d 1284, 1287 (10th Cir. 2001).

We review the grant of a Rule 41(e) motion for an abuse of discretion. United States v. Grover, 119 F.3d 850, 851 (10th Cir. 1997).  Under this standard we do not defer to the district court's legal conclusions.  Koon v. United States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.").

### B.    Standing

Before reaching the merits, we must first consider whether claimants have

---

[7] Because we conclude that the district court correctly concluded that the regulations as applied to Mr. Saenz violate RFRA, we do not reach this latter question.

standing to bring suit in federal court. The government asserts that none of the claimants has standing because they never actually applied for permits.[8] Several courts have addressed this question, finding that, where an individual never actually applied for a permit, he cannot thereafter complain that the permitting process harmed his constitutional rights. E.g., United States v. Hugs, 109 F.3d 1375, 1378 (9th Cir. 1997) (per curiam); United States v. Lundquist, 932 F. Supp. 1237, 1242 n.5 (D. Or. 1996). When, however, it would have been futile for a claimant to apply for a benefit, courts have not denied the claimant standing because of his failure to apply. Jackson-Bey v. Hanslmaier, 115 F.3d 1093, 1096 (2d Cir. 1997) ("Th[e] threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application for the benefit . . . would have been futile.") (but denying standing because facts did not show futility) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 363-67 (1977)); see also, e.g., Ellison v. Connor, 153 F.3d 247, 255 (5th Cir. 1998) (finding standing where claimants had not applied for a permit to build, but had been told previously that no construction of any structure would be permitted on their land); Desert Outdoor Adver., Inc. v. City of Moreno Valley, 103 F.3d 814,

---

[8] Mr. Hardman did actually apply for a permit after Officer Murray seized the feathers. Such a post hoc application is not sufficient to establish standing, however. Mr. Wilgus asserted in his brief on appeal that he had applied for a permit, but he provided no evidence of his application. Mr. Saenz does not contest that he never applied for a permit.

818 (9th Cir. 1996) (claimants had standing to challenge permitting process for signs, because City had previously sued for removal of signs, and because ordinance "flatly prohibited" signs). The government acknowledges that each claimant would have been denied a permit based on his failure to fulfill the requirement of membership in a federally recognized tribe.[9] Indeed, the application itself requires certification of membership. Because it would have been futile for these individuals to apply for permits, we find that they have standing to challenge the statutory and regulatory scheme.

C.    The Statutory Protection of Bald and Golden Eagles

The Migratory Bird Treaty Act ("MBTA") and the Bald and Golden Eagle Protection Act are two of our nation's oldest conservation statutes. Congress enacted these statutes against the background of the Migratory Bird Treaties.[10]

_____

[9] In fact, Mr. Hardman made a good faith effort to apply, and he was rebuffed in exactly the same manner he would have been had he actually applied.

[10] The Migratory Bird Treaty was initially signed by the United States and Great Britain (on behalf of Canada) in 1916, and the United States has since concluded similar treaties with Mexico (1936), Japan (1972), and the former Soviet Union (1976). Larry Martin Corcoran & Elinor Colbourn, Shocked, Crushed and Poisoned: Criminal Enforcement in Non-Hunting Cases Under the Migratory Bird Treaties, 77 Denv. U. L. Rev. 359, 361 (1999). While the treaty initially listed only the economic benefits of protecting the birds as its purposes, later protocols included sport, aesthetic, scientific, and cultural purposes. See id. at 362; see also Missouri v. Holland, 252 U.S. 416, 435 (1920) (describing the need to protect birds as food sources and to consume insect pests). The convention with Great Britain provides that "as an effective means of preserving migratory birds there shall be established . . . close seasons during which no

(continued...)

-12-

To fulfill the obligations of these treaties, Congress enacted the Migratory

Bird Treaty Act, which provides that "it shall be unlawful . . . to . . . possess [or]

purchase . . . any migratory bird, any part, nest, or egg of any such bird, or any

product . . . which consists . . . of any such bird or any part, nest, or egg thereof."

16 U.S.C. § 703. Section 704 of the Act authorizes the Secretary of the Interior

to promulgate necessary regulations to allow hunting or possession of migratory

birds "in order to carry out the purposes of the conventions." Section 707

provides for fines of up to $15,000 and/or imprisonment for up to six months for

---

[10](...continued)
hunting shall be done except for scientific or propagating purposes under permits
issued by proper authorities." Convention for the Protection of Migratory Birds,
Aug. 16, 1936, U.S.-Gr. Brit., art. II, 39 Stat. 1702, 1703. The treaty with Mexico
requires the protection of migratory birds by means "which will permit, in so far
as the respective high contracting parties may see fit, the utilization of said birds
rationally for purposes of sport, food, commerce and industry." Convention for
the protection of migratory birds and game mammals, Feb. 7, 1936, U.S.-Mex.,
art. I, 50 Stat. 1311, 1312. Article II of that treaty provides, inter alia, for the
establishment of seasons when the taking of migratory birds is not permitted, and
a limitation of hunting seasons to four months. Id., art. II, 50 Stat. at 1312. The
convention with the Soviet Union provides: "Each Contracting Party shall
prohibit the taking of migratory birds . . . [S]ale, purchase or exchange of these
birds, whether dead or alive, or their nests or eggs, and any sale, purchase or
exchange of their products or parts, shall be prohibited." Convention Concerning
the Conservation of Migratory Birds and Their Environment, Nov. 19, 1976, U.S.-
U.S.S.R., art. II(1), 29 U.S.T. 4647. The treaties with Mexico and the former
Soviet Union cover bald and golden eagles, while the treaty with Great Britain
(Canada) apparently does not. Agreement Supplementing the Agreement of
February 7, 1936, Mar. 10, 1972, U.S.-Mex., 23 U.S.T. 260, 260; U.S.-U.S.S.R.
Treaty, app., 29 U.S.T. at 4661; U.S.-Gr. Brit. Treaty, art. I, 39 Stat. at 1702-
1703; Protocol Amending the 1916 Convention for the Protection of Migratory
Birds, Dec. 5, 1995, U.S.-Can., art. I, S. Treaty Doc. 104-28 (1996).

violations of the MBTA, the conventions, or the regulations.

The Bald and Golden Eagle Protection Act makes clear in its enacting clause that its purpose is to protect the bald eagle from extinction. Bald Eagle Protection Act, ch. 278, 54 Stat. 250 (1940) (codified as amended at 16 U.S.C. §§ 668-668d); see also Andrus v. Allard, 444 U.S. 51, 52-53 (1979) (noting that the BGEPA and the MBTA are "designed to prevent the destruction of certain species of birds"). While the original 1940 Act only protected the bald eagle, it was extended in 1962 to protect golden eagles, which are easily confused with bald eagles, and to allow Indians to use eagle parts in religious ceremonies. Matthew Perkins, The Federal Indian Trust Doctrine and the Bald and Golden Eagle Protection Act: Could Application of the Doctrine Alter the Outcome in U.S. v. Hugs?, 30 Envtl. L. 701, 705 (2000). The text of the Act provides that "[w]hoever, without being permitted to do so . . . shall knowingly . . . take, possess, sell, [or] purchase . . . any bald eagle commonly known as the American eagle, or any golden eagle . . . or any part, nest, or egg thereof . . . shall be fined not more than $5,000 or imprisoned not more than one year or both." 16 U.S.C. § 668. Section 668a grants the Secretary of the Interior a broader permitting power than does the MBTA. The Secretary may authorize permits – so long as they are compatible with the preservation of the eagles – for public museums, scientific societies, zoos, Indian religious uses, wildlife protection, and agricultural

-14-

protection. The Secretary may also permit the taking of golden eagle nests that interfere with resource development.

The two acts share regulations. Under these regulations, eagles are migratory birds covered by the treaties. 50 C.F.R. § 10.13. An individual may not possess or transport bald or golden eagle parts, nests, or eggs, unless a permit is obtained from the Federal government. Id. § 22.11.[11] Rather, dead eagle parts and feathers are sent to the National Eagle Repository in Commerce City, Colorado. The Repository receives eagles and eagle parts and distributes them to permit holders on a first-come first-served basis.[12] Demand exceeds supply, however, and, according to a Fish and Wildlife Service official who testified in Mr. Saenz's case, successful permit applicants wait three years for an eagle carcass and six to nine months for loose feathers.

The Secretary of the Interior may grant permits to "members of Indian entities recognized and eligible to receive services from the United States Bureau of Indian Affairs . . . engaged in religious activities . . . ." Id. § 22.22. A permit is not automatically issued if these criteria are met, however, as the government will still consider the effect that the permit would have upon the wild populations

[11] Permits are not required, however, for bald eagle parts, nests, or eggs that were acquired prior to June 8, 1940, or for golden eagle parts, nests, or eggs that were acquired prior to October 24, 1962. 50 C.F.R. § 22.2.

[12] Exceptions are made for death ceremonies and other emergencies that require parts immediately.

of bald or golden eagles and whether the applicant is participating in bona fide tribal religious ceremonies. Id. § 22.22(c)(1)-(2). The regulations also create permit exemptions for scientific and exhibition purposes, id. § 22.21, for eagles that prey upon livestock or damage agriculture, id. § 22.23, and for falconry purposes, id. § 22.24. The regulations further indicate that eagles or eagle parts possessed under such a permit may not be transferred, except to be handed down from generation to generation or from Indian to Indian in accordance with tribal or religious custom. Id. § 22.22(b)(1).

D.    Sua Sponte Consideration of RFRA

Having examined the scope of the BGEPA and the MBTA, we must next consider whether to apply RFRA to Mr. Hardman and Mr. Wilgus, who did not preserve this issue for appeal. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976). However, the general rule is that this court will not exercise that power, and will not consider issues not raised by the parties on appeal. Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 720 (10th Cir. 1993) (citing Singleton, 428 U.S. at 120). The overriding rationale for this policy is that it is "essential in order that parties may have the opportunity to offer all the evidence that they believe relevant to the issues . . . [and] in order that litigants

-16-

may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1538-39 (10th Cir. 1996) (quoting Singleton, 428 U.S. at 120).

Our cases have also made clear, however, that "in some circumstances, resolution of issues not raised below is justified." Id. at 1538. Assuming that the constitutional requirement of a "case and controversy" would still be met by considering the issue,[13] the rule is prudential, and "a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." United Nat'l Bank v. Indep. Ins. Agents, 508 U.S. 439, 447 (1993) (citing Arcadia v. Ohio Power Co., 498 U.S. 73, 77 (1990)).[14] In light of these concerns, we consider whether to apply RFRA to Mr. Hardman's and Mr. Wilgus's cases.

We conclude that the unique procedural posture of this case makes sua sponte consideration of RFRA appropriate. The order of this court mandating that the cases be reheard en banc requested that all parties brief the RFRA issue –

---

[13] No party disputes that this requirement is satisfied here.

[14] While the Court in Singleton v. Wulff identified situations where "injustice might otherwise result" and where "the proper resolution is beyond any doubt" as situations where sua sponte consideration of issue not briefed was appropriate, it also made clear that those scenarios were not exhaustive. 428 U.S. at 121 & n.8.

-17-

including whether the court should consider RFRA in Mr. Hardman's and Mr. Wilgus's cases at all. The RFRA issue was raised in all three trial courts, and was briefed and argued by the United States before the Saenz panel of this court. All parties were thus put on notice that the RFRA issue would be raised, and all had an opportunity to brief the issue. Therefore, "[i]t would not satisfy any policy behind the rule to turn our back on this significant question." Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1229 (10th Cir. 1996) (finding that where the issue was raised in a reply brief in the district court, where both parties had briefed the issue on appeal, and where judicial resources would be conserved by considering the issue sua sponte, that such action was warranted).

Moreover, several other concerns weigh in favor of considering the issue. It is well-established that "the proper administration of the criminal law cannot be left merely to the stipulation of parties." Young v. United States, 315 U.S. 257, 259 (1942); see also DeRoo v. United States, 223 F.3d 919, 926 (8th Cir. 2000) ("Although [defendant] has not raised this issue, appellate courts can examine a critical issue affecting substantial rights sua sponte in criminal cases under Federal Rule of Criminal Procedure 52(b)."). Both Mr. Hardman's and Mr. Wilgus's cases are criminal in nature. In addition, it is well-settled that federal courts should avoid deciding constitutional issues when statutory issues are dispositive. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 112 (1998)

-18-

(Stevens, J., concurring) (citing Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)); Jean v. Nelson, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."). Deciding this case on RFRA grounds allows us to avoid the First Amendment issue.

The holding here is extremely narrow. We consider this issue sua sponte only because all parties were put on notice by the en banc order, and then only because the adversely affected party – the United States – had an opportunity to develop a factual record in the district court in one of the consolidated cases. Thus, the prudential concerns that normally weigh against sua sponte consideration are not present here. Moreover, the fact that the cases are criminal in nature and present a statutory question that allows us to avoid complex constitutional issues adds prudential concerns in support of considering the RFRA issue. In these somewhat unique circumstances, we exercise our discretion, and consider the RFRA issue.[15]

---

[15] Because we decide to address the RFRA issue on these grounds, we do not consider whether courts must necessarily apply RFRA in all cases involving Free Exercise claims. Compare Diaz v. Collins, 114 F.3d 69, 71 & n.7 (5th Cir. 1997) (holding that RFRA applies in Free Exercise cases whether it is raised by the parties or not), with First Assembly of God of Naples, Florida, Inc. v. Collier County, 27 F.3d 526, 526 (11th Cir. 1994) (per curiam) (declining to apply RFRA when it was not raised by a party), denying reh'g in 20 F.3d 419 (11th Cir. 1994). We have previously indicated that RFRA applies to all First Amendment

(continued...)

-19-

E.      The Religious Freedom Restoration Act of 1993

Congress enacted the Religious Freedom Restoration Act against the background of Free Exercise Clause law. The "religion clauses" of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. In Sherbert v. Verner, the Court determined that "any incidental burden on the free exercise of appellant's religion [must] be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate.'" 374 U.S. 398, 403 (1963) (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)).[16] Although the precise language of the test has changed somewhat, the essence of the inquiry remained the same throughout the 1970's

---

[15](...continued)
claims even when it was not raised by the parties. Werner v. McCotter, 49 F.3d 1476 (10th Cir. 1995). However, in Werner, decided prior to City of Boerne, we were laboring under the false understanding that RFRA "legislatively overturned a number of recent Supreme Court [free exercise] decisions" and that it created a new rule of constitutional law. Id. at 1479. Thus, we concluded that because the language of RFRA made it applicable to "all cases where free exercise of religion is substantially burdened," 42 U.S.C. § 2000bb(b)(1), its standard ought to control a Free Exercise Clause claim even when not raised. Id. Because the Supreme Court has made clear that the Werner court's assumptions about RFRA were faulty, its rationale is no longer convincing.

[16] The Supreme Court has offered an alternate explanation for Sherbert in Employment Div. v. Smith, 494 U.S. 872 (1990). Under this interpretation, Sherbert and its progeny "stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without a compelling reason." Smith, 494 U.S. at 884.

-20-

and 80's: The state must demonstrate that the law in question is narrowly tailored to achieve a compelling government interest. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."); Thomas v. Review Bd., 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."); Gillette v. United States, 401 U.S. 437, 462 (1971) ("The incidental burdens felt by persons in petitioners' position are strictly justified by substantial governmental interests that relate directly to the very impacts questioned.").

A series of cases in the late 1980s, however, indicated a shift in Free Exercise Clause jurisprudence. In these cases, the Supreme Court refused to apply strict scrutiny to free exercise challenges to prison regulations, internal government activities, and military regulations. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-50 (1987) (prison regulations); Bowen v. Roy, 476 U.S. 693, 707-08 (1986) (internal government activities); Goldman v. Weinberger, 475 U.S. 503, 507-08 (1986) (military regulations). Instead, the Court used a rational basis test to evaluate these government actions, despite their clear impact on the free exercise of religion. The trend culminated in the rule announced in Employment

Division v. Smith, 494 U.S. 872 (1990). There, practitioners of a Native American religion asked the Court to apply strict scrutiny to a statute restricting the use of peyote. Not only did the Court refuse to create the accommodation, it ruled that "the right of free exercise [of religion] does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability,'" Smith, 494 U.S. at 879 (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)), and that such a law need not be justified by a compelling interest even where religious practice is substantially burdened, id. at 888-89. In effect, Smith creates a "safe harbor" – if the law is "a valid and neutral law of general applicability," then it must simply be rationally related to a legitimate government end.

In response to the Court's decision in Smith, Congress passed the Religious Freedom Restoration Act of 1993. S. Rep. 103-111, 1993 U.S.C.C.A.N. 1892, 1893 ("[T]he Religious Freedom Restoration Act of 1993[] responds to the Supreme Court's decision in Employment Division, Department of Human Resources of Oregon v. Smith by creating a statutory prohibition against government action substantially burdening the exercise of religion."). RFRA states: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. § 2000bb-1(a). Subsection (b)

provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id. § 2000bb-1(b).

The Supreme Court, in City of Boerne v. Flores, 521 U.S. 507 (1997), held that Congress lacked authority to enact such a law through the Enforcement Clause of the Fourteenth Amendment, thus making RFRA inapplicable to actions against the states. After City of Boerne, however, it remained an open question whether RFRA created an extra-constitutional statutory claim against the federal government, justified through its Article I, section 8 "necessary and proper" powers. We recently answered that question in the affirmative. Kikumura v. Hurley, 242 F.3d 950, 959 (10th Cir. 2001) ("[T]he separation of powers concerns expressed in Flores do not render RFRA unconstitutional as applied to the federal government."). Because claimants challenge federal law, it is appropriate to consider RFRA, even in light of City of Boerne.

Here, the government does not dispute that claimants' beliefs are sincerely held or that the regulations represent a substantial burden upon claimants' religious beliefs. The eagle feather is sacred in many Native American religions,

-23-

including claimants'.[17]  Any scheme that limits their access to eagle feathers

therefore must be seen as having a substantial effect on the exercise of religious

belief.  United States v. Thirty-Eight Golden Eagles, 649 F. Supp. 269, 276 (D.

Nev. 1986), aff'd 829 F.2d 41 (9th Cir. 1987).  Given this, we next consider

whether the regulations governing the BGEPA and MBTA: (1) advance a

compelling government interest; and (2) are the least restrictive means of

furthering that interest.

    1.    Compelling Interests

Whether something qualifies as a compelling interest is a question of law.

Citizens Concerned About Our Children v. School Bd., 193 F.3d 1285, 1292 (11th

Cir. 1999); Concrete Works of Colo., Inc. v. City and County of Denver, 36 F.3d

1513, 1522 (10th Cir. 1994).  There is, however, little guidance from the Supreme

Court in determining what qualifies as a compelling interest.  In Wisconsin v.

Yoder, the Court defined a compelling interest as "only those interests of the

---

[17] We acknowledge that Native American religions are rich in variety, and that lumping any particular belief system under the term "Native American" religion is somewhat akin to lumping all the sects of Judaism, Christianity, and Islam together under the term "Western" religions.  We acknowledge that not all Native American tribes believe that the eagle feather is sacred.  Freddie Kaydahzinne, a member of the Mescalero Apache, testified at Mr. Saenz's hearing that turkey feathers are sacred to the Pueblo, water birds to some of the Oklahoma tribes, caribou to others, etc.  We do not belittle this diversity.  For the sake of simplicity only we refer to those Native American religions that hold the eagle feather as sacred under a collective "Native American religions."

highest order." 406 U.S. 205, 215 (1972) ("[O]nly those interests of the highest order and not otherwise served can overbalance legitimate claims to the free exercise of religion."). In Sherbert v. Verner, the Court stated that "[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation." 374 U.S. 398, 406 (1963) (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)). Examples of compelling interests include maintaining the tax system, Hernandez v. Comm'r, 490 U.S. 680, 699 (1989), enforcing participation in the social security system, United States v. Lee, 455 U.S. 252, 258-59 (1982), and protecting children's welfare, Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944). We have held, however, that a desire for federal funds is not a compelling interest, Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1280 (10th Cir. 1996), while the Eighth Circuit has held that the interests advanced by the bankruptcy system are not compelling. In re Young (Christians v. Crystal Evangelical Free Church), 82 F.3d 1407, 1420 (8th Cir. 1996).

Given these broad contours, we consider the interests that the United States argues are compelling: (a) protecting eagles and (b) preserving Native American culture and religion and pursuing the federal government's trust obligations to Native American tribes.

### a. Protecting Eagles

There is dicta from the Supreme Court indicating that the protection of

-25-

migratory birds might qualify as a compelling interest. Missouri v. Holland, 252 U.S. 416, 435 (1920) (referring to the protection of migratory birds as "a national interest of very nearly the first magnitude."). We cannot ignore that the migratory bird in question here is the symbol of our nation, heightening the government's interest in keeping the species viable.[18] Moreover, most other courts that have addressed this issue have agreed that the preservation of eagle species represents a compelling interest. United States v. Oliver, 255 F.3d 588, 589 (8th Cir. 2001); United States v. Hugs, 109 F.3d 1375, 1378 (9th Cir. 1997) (per curiam); Gibson v. Babbitt, 72 F. Supp. 2d 1356, 1360 (S.D. Fla. 1999), aff'd, 223 F.3d 1256 (11th Cir. 2000).

Claimants assert that the increased number of bald and golden eagles undercuts the compelling nature of the government's interest. This view finds some limited support in the case law. United States v. Abeyta, 632 F. Supp. 1301, 1307 (D.N.M. 1986) (finding that the record did not support a compelling interest in golden eagle preservation); cf. Horen v. Commonwealth, 479 S.E.2d 553, 559-560 (Va. App. 1997) (finding that, because the state had not shown that owls were

---

[18]The prohibition on hunting golden eagles is intrinsically related to the prohibition on hunting bald eagles. It is difficult to distinguish between golden and bald eagles under three years of age. United States v. Lundquist, 932 F. Supp. 1237, 1241 (D. Ore. 1996). In order to prevent accidental shooting, and because golden eagles were also in decline, Congress banned the hunting of both bird species.

endangered, there was no compelling interest in their preservation). We disagree. The bald eagle would remain our national symbol whether there were 100 eagles or 100,000 eagles. The government's interest in preserving the species remains compelling in either situation. What might change depending on the number of birds existing is the scope of a program that we would accept as being narrowly tailored as the least restrictive means of achieving its interest. Thus, we agree that the government's interest in preserving eagle populations is compelling.

b. Protecting Native American Culture/Treaty Obligations

The government also asserts a compelling interest in preserving Native American culture and religion. The government is correct that it has a longstanding obligation to preserve Native American cultures. Along with Congress's power to "regulate Commerce . . . with the Indian Tribes" comes an obligation of trust to protect the rights and interests of federally recognized tribes and to promote their self-determination. Morton v. Mancari, 417 U.S. 535, 552 (1974) (quoting U.S. Const. art. I, § 8, cl. 3); see also Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557 (1832); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 16 (1831). Thus, we have little trouble finding a compelling interest in protecting Indian cultures from extinction, growing from government's "historical obligation to respect Native American sovereignty and to protect Native American culture." Rupert v. Director, U.S. Fish & Wildlife Serv., 957 F.2d 32, 35 (1st Cir. 1992);

see also Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1216 (5th Cir. 1991) (noting that preservation of Indian culture is "fundamental to the federal government's trust relationship with tribal Native Americans").

In a closely related argument, the government urges that the "unique guardian-ward relationship between the federal government and Native American tribes" allows the permitting scheme to avoid strict scrutiny altogether. It is true that, based on this trust relationship, Congress possesses an "extraordinarily broad" power to legislate with respect to Indian tribes, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 (1978), and categories respecting Native Americans are sometimes political, rather than religious or racial distinctions, United States v. Antelope, 430 U.S. 641, 645-46 (1977). As a result, laws that "might otherwise be constitutionally offensive" might be acceptable if they are enacted pursuant to the United States' trust relationship. Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 501 (1979) (citing Mancari, 415 U.S. at 551-52). The Supreme Court has therefore held that limited hiring preferences for Native Americans at the Bureau of Indian Affairs did not constitute unlawful race discrimination. Mancari, 417 U.S at 553-54. Other circuits have extended this principle to the Establishment Clause context. Rupert, 957 F.2d at 35 (rejecting a non-Native American's Establishment Clause challenge to permit regulations under the BGEPA); Thornburgh, 922 F.2d at 1217 (finding no

-28-

Establishment Clause violation where federal law exempted members of the Native American Church from a prohibition on peyote possession); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 540 (1993) (Kennedy, J., and O'Connor, J.) ("In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases.").

However, such analysis is irrelevant in the RFRA context. RFRA plainly commands that a federal program that substantially burdens religion must be the least restrictive means of achieving a compelling government interest. Our focus here, under RFRA, is not whether the government may set up a different system for tribal adherents of Native American religions than for non-tribal adherents. Rather, it is whether the government may burden the religious beliefs of non-tribal adherents in the first place.

In sum, the government's general interests in preserving Native American culture and religion in-and-of-themselves and in fulfilling trust obligations to Native Americans remain compelling interests.[19] The government's plenary

---

[19] The government asserts that it has a compelling interest in fulfilling treaty obligations to Native Americans. This argument lacks merit. As the government acknowledges in its brief, the Supreme Court has held that the BGEPA abrogated prior treaties granting Native Americans hunting rights with respect to bald and golden eagles. United States v. Dion, 476 U.S. 734, 745 (1986). The government argues that the regulations at issue here replace the prior

(continued...)

-29-

power to legislate with respect to Native American Tribes does not, however, in the context of a RFRA challenge, relieve the government of its burden to prove that the statute and regulations constitute the least restrictive means of achieving its goals.

### 2. Least Restrictive Means

The two dispositive questions under RFRA are whether application of the permitting process to claimants furthers the government's compelling interests, and whether it is the "least restrictive means" of furthering those interests. 42 U.S.C. § 2000bb-1(b). This statutory language must guide our analysis.

The statute directs that, in interpreting "least restrictive means," courts should view the Act as "restor[ing] the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205." 42 U.S.C. § 2000bb(b); see also S. Rep. 103-111, 1993 U.S.C.C.A.N. 1892, 1898 ("The Religious Freedom Restoration Act of 1993 is intended to restore the compelling interest test previously applicable to free exercise cases . . . . The committee expects that the courts will look to free exercise cases decided prior to

---

[19](...continued)
treaty obligations. We are unpersuaded. It does not follow from the BGEPA's abrogation of certain treaty rights that the "Indian tribes" exception was meant to replace those rights. Moreover, the exception is limited to "religious purposes," whereas the rights that Dion held Congress had abrogated involved hunting. Thus, the government has not shown that fulfillment of treaty obligations is a compelling interest.

Smith for guidance in determining whether the exercise of religion has been substantially burdened and the least restrictive means have been employed in furthering a compelling governmental interest."); id. at 1898 ("Therefore, the compelling interest test generally should not be construed more stringently or more leniently than it was prior to Smith."). In the context of these cases, "least restrictive means" is a severe form of the more commonly used "narrowly tailored" test. Sherbert, 374 U.S. at 407 ("[E]ven if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, it would plainly be incumbent upon the appellees [i.e., the government] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." Id. at 407 (emphasis added); Yoder, 406 U.S. at 215 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.") (emphasis added); see also Hialeah, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree. The absence of narrow tailoring suffices to establish the invalidity of the ordinances."). Given these contours, we evaluate the regulatory scheme for the BGEPA and MBTA to determine whether they are sufficiently narrowly tailored and represent

the least restrictive means of achieving a compelling interest.

We next address the proper standard of review for evaluating a trial judge's determination that a law represents the least restrictive means of achieving a compelling interest. We are aware of only one circuit that has addressed whether "least restrictive means" in the context of RFRA is a legal issue, a factual issue, a mixed question of law and fact, or a question of constitutional fact.[20] However, due to the dearth of factual findings on the records before us, we need not address that question today. Irrespective of which particular standard of review we use, the burden of building the record for our review falls upon the United States. Werner v. McCotter, 49 F.3d 1476, 1480 n.2 (10th Cir. 1995). Mere speculation is not enough to carry this burden. Sherbert, 374 U.S. at 407 ("The[State] suggest[s] no more than a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling

---

[20] In re Young, 82 F.3d 1407, 1419 (8th Cir. 1996), vacated & remanded on other grounds, 521 U.S. 1114 (1997), reinstated, 141 F.3d 854 (8th Cir. 1998). Several district courts have found least restrictive means to be a purely factual question. Sledge v. Cummings, 1996 WL 665450, at *4 (D. Kan. 1996) ("[W]hether the head wear [sic] restrictions represent the least restrictive means of furthering their legitimate security goals remains a question of fact . . . ."); Rust v. Clarke, 851 F. Supp. 377, 380 (D. Neb. 1994) ("Moreover, all of the defense affidavits appear to have been drafted without the Act's substantive provisions in mind, particularly ignoring the factual question of whether the Defendants have employed 'the least restrictive means of furthering th[e] compelling governmental interest.'").

by employers of necessary Saturday work. . . . [T]here is no proof whatever to warrant such fears of malingering or deceit as those which the [State] now advance[s].”); Yoder, 406 U.S. at 224-25 (calling for “specific evidence” of the interests advanced and how accommodation would affect them); Werner, 49 F.3d at 1480 (stating that “the state must do more than simply offer conclusory statements” to satisfy its burdens) (citation omitted).

For the reasons set forth below, in the absence of any factual record in Hardman and Wilgus, it is appropriate to remand for factfinding under any standard of review. Similarly, it is appropriate to affirm the district court in Saenz whether we subject a district court’s determination on the least restrictive means to de novo review, or merely for clear error.

F.    Application to Hardman, Wilgus, and Saenz

1.    Hardman and Wilgus

The government bears the burden of building a record that proves that the statutory and regulatory scheme in question is the least restrictive means of advancing the government’s compelling interests. In these two cases, the RFRA claims were dismissed in light of City of Boerne as a matter of law before trial. The government thus has not had an opportunity to build a record with respect to either case. We therefore REMAND these cases to afford both parties an opportunity to develop a record, and for a determination as to whether these

-33-

regulations represent the least restrictive means of advancing the government's interests.

2.    Saenz

We are in a different situation with regard to Mr. Saenz. The government did build a record in the district court with respect to Mr. Saenz. Therefore, we examine the record to determine if the government has carried its burden of proving the least restrictive means of carrying out its interests. First, however, the government claims at oral argument that we should remand because the district court failed to convert Mr. Saenz's action, which was brought under Rule 41 of the Federal Rules of Criminal Procedure, into a civil action. Such a conversion would require that the suit be governed by the Federal Rules of Civil Procedure, giving the government access to full discovery, depositions, and the like.

It is true that when criminal charges have been dismissed, a court should treat a Rule 41(e) motion as a civil complaint. United States v. Clark, 84 F.3d 378, 381 (10th Cir. 1996). However, the government raised this argument for the first time on appeal in a footnote in its en banc brief. Arguments raised in a perfunctory manner, such as in a footnote, are waived. United States v. White, 879 F.2d 1509, 1513 (7th Cir. 1989). Unlike the broader RFRA question, we did not direct briefing on this argument, and Mr. Saenz was not put on notice at any

other point during this appeal or through the Hardman or Wilgus briefs that we might consider this issue on appeal. Additionally, we cannot say that the government was substantially prejudiced by the lower court's denial of the government's motion to treat the 41(e) motion as a civil complaint, as the lower court conducted a thorough two day evidentiary hearing, with witnesses called by both sides. We therefore decline to consider the question sua sponte, and we consider the record as it stands before us. Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 720 (10th Cir. 1993) (citing Singleton v. Wulff, 428 U.S. 106, 120 (1976)) (noting that the general rule is not to consider issues that a party has not raised on appeal).

We move on, then, to the question of whether the government has met its burden of proving that the permitting scheme is the least restrictive means of advancing its compelling interests. We note at the outset that the government relies in part upon a number of cases in which courts have held that the regulations at issue here are the least restrictive means of advancing the government's interests. See, e.g., Rupert, 957 F.2d at 35-36 ("The exemption, therefore, does not merely serve the government's interests . . . it sets them in equipoise. . . . Any diminution of the exemption would adversely affect the former interest [in protecting Native American culture], but any extension of it would adversely affect the latter [in protecting eagles]."). While we would

-35-

generally give weight to such persuasive authority, we are unable to do so given the poorly developed record in the cases at hand. Here, as we explain below, the government has failed to demonstrate how the current regulations <u>serve</u> each of its asserted interests – a necessary step in the process of showing that the regulations are the least restrictive means of serving the government's interests. The record is devoid of hard evidence indicating that the current regulations are narrowly tailored to advance the government's interests, and it does not address the possibility of other, less restrictive means of achieving these interests. We therefore find that, on the record presented in <u>Saenz,</u> the government has failed to show that limiting permits for eagle feathers only to members of federally recognized tribes is the least restrictive means of advancing the government's interests in preserving eagle populations and protecting Native American culture.

a. <u>Protecting Eagles</u>

We first consider how excluding sincere practitioners of Native American religions who are not members of federally recognized tribes from applying for permits advances the government's interest in preserving the eagle population. Presumably, expanding the permit process to include non-Native American adherents would have no effect on bird populations – as long as the total number of permits available stayed constant, such an expansion would at worst create a longer wait list for parts. We do not, however, make rulings on presumptions.

-36-

Instead, it is incumbent upon the government to build a record that either contradicts or confirms these presumptions.

Here, the government has not carried its burden. The government offers two arguments. First, the government presented an estimate of the number of members of federally-recognized tribes versus the number of Americans who identify themselves as having Indian ancestry. The apparent purpose of these estimates is to support an extrapolation that expanding the permitting process would expand the number of permit applicants, thereby further endangering eagle populations. The record contains no evidence indicating that increased permit applications would place increased pressure on eagle populations. Such a result seems highly unlikely, especially since the impact upon eagle populations is an explicit consideration in determining whether or not to grant a permit. Moreover, the data provided are largely irrelevant. The relevant comparison is between members of federally recognized tribes who hold the eagle feather as sacred and other persons who hold a sincere religious belief that the eagle feather is sacred. The government's estimation process is akin to attempting to extrapolate the number of practicing Catholics in the country by identifying the number of Irish-Americans. We will not engage in such extrapolation here.

Second, the government argues that increasing the wait for parts will increase poaching. As evidence, it cites cases in which practitioners from

federally recognized tribes poached eagles rather than waiting for parts. From this, the government asks us to extrapolate that more applicants will lead to longer waits, which will lead to more poaching and further endanger the eagle. Assuming arguendo that there will be an increased wait for parts, the government's poaching argument misses the mark. The fact that some members of federally recognized tribes have poached eagles rather than waiting for parts does not, absent additional evidence, lead to the conclusion that increased waits will result in sufficient poaching to frustrate the government's interest in protecting eagle populations. In the absence of additional evidence, the opposite conclusion seems equally plausible. While the wait might increase for members of federally recognized tribes, it would decrease for sincere practitioners who are not members of federally recognized tribes, who currently have no legal access to eagle parts for religious purposes. This approach could result in an offsetting decrease in poaching by people who are not members of federally recognized tribes. People with no opportunity to receive eagle feathers might be more likely to poach than those who must simply wait. At any rate, these questions remain unanswered in the record in this case, and it was incumbent upon the government to answer them.[21]

---

[21] The government's statistic that there are only 40 nesting pairs of eagles in the Southwest is largely irrelevant. 64 Fed. Reg. 36,458. What is more

(continued...)

b.      Protecting Native American Culture

We next consider to what degree excluding non-tribal members from the permitting scheme advances the government's interest in preserving Native American cultures and fulfilling trust obligations. We find that the United States has failed to build an adequate record on this question. The only evidence offered by the government that Native American culture would be endangered by expanding the permitting process to include all bona fide practitioners of Native American faiths is the speculative testimony of a Fish and Wildlife Service official, similar testimony from a member of the Mescalero Apache tribe, and evidence that there is currently a wait for parts.[22] The government cannot carry its burden through mere speculation. The government has failed to present any

----

[21](...continued)
relevant is whether the numbers are increasing or decreasing, and what the overall status of eagle populations throughout the country is. Finally, the crucial and unanswered question remains what the effect would be of expanding the register to include all Native Americans who are sincere practitioners of Native American religions.

[22] The government also points to Gibson v. Babbitt, 223 F.3d 1256 (11th Cir. 2000), where the Eleventh Circuit found that "it is clear from the record that without the exemption the limited supply of bald and golden eagle parts will be distributed to a wider population and the delays will increase in providing eagle parts to members of federally recognized Indian Tribes . . . ." Id. at 1258. However, as the quotation itself illustrates, this ruling was made on a different record. The record that we have today is practically barren as to the impact of a potential expansion of the permitting process to include all sincere practitioners of Native American faith who hold the eagle feather to be sacred. This is the key distinction between the instant cases and Gibson.

-39-

hard evidence that there are substantial numbers of individuals who are not members of federally recognized tribes, but who are sincere practitioners of Native American faiths that hold eagle feathers to be sacred and could be expected to apply for permits. Thus, it has failed to show that broader eligibility would result in an increased wait substantial enough to endanger Native American cultures. The government gives no consideration to any offsetting increase in available parts from any recovery of bald and golden eagle population. Moreover, the government offers no evidence on the threshold question of whether allowing sincere practitioners who are not members of federally recognized tribes to possess eagle feathers, in addition to those who are members, truly threatens Native American culture. Allowing a wider variety of people to participate in Native American religion could just as easily foster Native American culture and religion by exposing it to a wider array of persons.[23]

---

[23] Footnote 2 of the concurrence suggests that this example confuses the possible scope of the compelling interest in preserving Native American culture. The concurrence questions whether we view the compelling interest as "limited to the maintenance of the viability of Native American cultural practices as a historical legacy within the contours of our modern culture," or as "guaranteeing that members of sovereign and semi-autonomous Indian nations have the ability to carry on their traditional way of life." Infra, at ___ (Murphy, J., concurring) .

We agree that simply guaranteeing that Native American cultural practices are somehow a part of our modern culture is too cramped a view of the compelling interest, and we wish to dispose of any notion that such a view is advanced by this opinion, or by Supreme Court jurisprudence. See United States v. Kagama, 118 U.S. 375, 381-85 (1886) (describing the government's interest in

(continued...)

Finally, the government has offered insufficient evidence regarding its trust

obligations to federally recognized Native American tribes. It has not shown, for

instance, that statutory protections for eagles (apart from the exception for

religious purposes) were motivated by trust obligations. Nor has it shown

precisely how restricting personal, individual permits for religious purposes to

members of federally recognized tribes is connected to the government's

sovereign-to-sovereign relationships with tribes. Thus, the government has not

shown that broader permit eligibility would damage the government's ability to

fulfill its trust obligations.

The government has failed to demonstrate how the permitting process

advances its compelling interests. It leaves far too many questions unanswered.

We therefore find that it has failed to carry its burden.

c.      Setting the Interests in Equipoise

As the First Circuit recognizes, and as Judge Murphy's opinion concurring

in the judgment emphasizes, the ultimate task for the district court is not to

---

[23](...continued)
protecting Native American culture as guaranteeing that the weakened Native
American nations could survive). We do not express an opinion on whether
distributing eagle feathers to sincere adherents of Native American faiths
irrespective of whether they were members of federally recognized tribes or not,
or of Native American lineage or not, would foster or inhibit this compelling
interest. We simply emphasize that it is the government's burden to build a
record clarifying how the regulations serve its interests. It may well be that it can
do so on remand in Hardman and Wilgus. It has not, however, done so in Saenz.

compartmentalize the interests as we do above. The First Circuit and Judge Murphy rightly point out that there is a great deal of interplay between the two compelling interests and that the ultimate test is whether the balance between the two interests struck by the government is achieved by the least restrictive means available. Infra at ___ (Murphy, J., concurring); Rupert v. Director, U.S. Fish & Wildlife Serv., 957 F.2d 32, 35 (1st Cir. 1992); see also United States v. Dion, 476 U.S. 734, 743-44 (1986) ("Congress . . . considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception . . . .").

This can be conceptualized as something of a sliding scale: At one extreme is a situation where nobody can hold eagle feathers, which would maximize eagle protection and set protection of Native American cultures at zero. At the other extreme is a situation where members of federally recognized tribes who are sincere practitioners of Native American religion are given full access to all the eagle feathers they desire, which minimizes protection of eagles.[24] The government has essentially chosen a point somewhere along this continuum which attempts to strike some type of balance between the two extremes. The ultimate question for the court, then, is whether the point that the government has chosen

---

[24] Of course, one might question whether this is really the other extreme; this would presumably result in the extinction of eagles, defeating both of the government's interests.

constitutes means that minimize the impact on religious adherents who are not members of federally recognized tribes.

Before that ultimate question can be addressed, however, we must first determine where along that continuum the government's present solution lies, and where other, less restrictive means would lie. This analysis is a necessary predicate to determining whether the government has properly set the interests in equipoise, and it requires that we compartmentalize our analysis somewhat. On appeal, it was the government's burden to show us how it was balancing the interests and that no other, less restrictive means existed to achieve a similar balance. From the record, we do not know how much, if at all, the government's regulatory scheme advances the interest in protecting eagles. Judge Murphy is correct in pointing out that, viewed as a whole, the BGEPA and MBTA surely advance the interest in eagle protection; no one is questioning the constitutionality of the MBTA/BGEPA as such. Similarly, allowing only a specified number of people to apply for permits also surely advances the government's interest. That is not questioned here either. What is questioned is how those permits are distributed. The question at the heart of this case is why an individual who is not a member of a federally recognized tribe is foreclosed from applying for a permit that may be used as a defense to criminal prosecution for possession of eagle feathers, while an identically situated individual may apply

-43-

for a permit if she is a member of a federally recognized tribe. The government's interest in preserving eagles might have something to do with the total number of people who are allowed to acquire eagle feathers, but it quite possibly has little to do with the question here, which is how those permits are distributed. We do not, however, have a sufficient factual record to state even that conclusion with certainty, and this requires us to remand in Wilgus and Hardman and is fatal to the government's case in Saenz. The government also has not shown how many eagles exist, in what direction the eagle population is trending, how many people can be expected to apply for permits if the regulations change, how much additional delay in delivering eagle feathers to applicants could be expected under various alternative schemes, and how much such delays might impact Native American culture.

Thus, it is impossible for us to address whether the government has offered the least restrictive means of <u>balancing</u> the questions, because it has not established where on the above-described continuum of interests the current regulatory scheme lies, nor has it described where other, less restrictive alternatives lie on that continuum. In the end, the approach that this opinion takes is not particularly dissimilar from that contained in Judge Murphy's concurrence; we are simply attacking the question from different ends. On remand, if the district court is presented with sufficient factual evidence to enable it to

determine that the government is indeed balancing two interests, then it must proceed to an examination of the scheme under the Rupert framework as laid out in Judge Murphy's concurring opinion and this opinion. It should determine how the government has balanced the interests and should examine whether potentially broader, less burdensome regulations would allow it to strike a similar balance. But for the purposes of this appeal, we are simply not presented with adequate factual findings to make the necessary predicate determinations before proceeding to that step in the analysis.

### III. Conclusion

We have reached these conclusions on statutory grounds, which we addressed in part in order to avoid constitutional issues. See also Lyng v. Northwest Indian Cemetery Prot. Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). We therefore find it unnecessary to address Mr. Wilgus's free exercise claim or Mr. Hardman's free exercise and equal protection claims.

We therefore REMAND with respect to Mr. Hardman and Mr. Wilgus, and AFFIRM with respect to Mr. Saenz.

**HENRY**, J., concurs in the above opinion, and concurs in the reasoning of Judge **MURPHY's** opinion.

**MURPHY**, Circuit Judge, with whom Judge **BRISCOE** joins, concurring in part and concurring in the judgment.

By looking narrowly at a particular provision of the regulatory scheme at issue in this case,[1] i.e., the permitting process, the majority concludes in *Saenz* that the "government has failed to demonstrate how the permitting process advances its compelling interests." *See* Majority Op. at 41. I disagree. The regulatory scheme, when properly viewed in its entirety, clearly advances both the government's compelling interest in protecting eagles and its compelling interest in preserving Native American culture. Nevertheless, because the government failed to carry its burden of demonstrating that the regulatory scheme is the least restrictive means of setting its two compelling yet competing interests in equipoise, I would also affirm the district court in *Saenz*. This difference in approach is not pedantic. It is, instead, likely to have real significance in light of this court's remand of *Hardman* and *Wilgus* to the district court for further proceedings. Unfortunately, I fear the majority opinion in *Saenz* will misdirect

---

[1]The relevant regulatory scheme is comprised of the Migratory Bird Treaty Act, the Bald and Golden Eagle Protection Act, and their shared implementing regulations.

the district court upon remand in *Hardman* and *Wilgus*.

The regulatory scheme represents an attempt by Congress to harmonize, to the extent practicable, two competing interests: protection of eagle populations and preservation of Native American cultural practices. *See United States v. Dion*, 476 U.S. 734, 743-44 (1986) ("Congress . . . considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception . . . ."). The majority quite correctly recognizes that each of these interests is compelling in its own right. *See* Majority Op. at 27, 29. Under RFRA, the question then becomes whether the regulatory scheme furthers these two compelling yet competing interests and whether it is the "least restrictive means" of doing so. *See* 42 U.S.C. § 2000bb-1(b).

The majority concludes in *Saenz* that it need not decide whether the regulatory scheme is the least restrictive means of advancing the government's compelling yet competing interests because "[t]he government has failed to demonstrate how the permitting process advances its compelling interests." Majority Op. at 41; *see also* 42 U.S.C. § 2000bb-1(b) ("Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that

-2-

compelling governmental interest.").[2]  As set forth more fully below, I disagree both with the analytical approach utilized by the majority to reach this conclusion and with the conclusion itself.

The majority begins its analysis by "consider[ing] how excluding sincere practitioners of Native American religions who are not members of federally recognized tribes from applying for permits advances the government's interest in preserving eagle populations."  Majority Op. at 36.  The majority ultimately concludes that the government has failed to adduce any record evidence that the

---

[2]In light of the majority's conclusion in *Saenz* that the government failed to demonstrate that the regulatory scheme advances its compelling interests and the conclusion in *Hardman* and *Wilgus* that the record is insufficient to undertake any RFRA analysis at all, the entire extensive discussion of RFRA's least-restrictive-means requirement set out at Section II.E.2. of the majority opinion appears to be dicta.  Admittedly, however, the exact basis for affirming the district court in *Saenz* is not clear from the majority opinion.  *Compare* Majority Op. at 36 ("Here, as we explain below, the government has failed to demonstrate how the current regulations serve each of its asserted interests—a necessary step in the process of showing that the regulations are the least restrictive means of serving the government's interests."), *and id.* at 41 ("The government has failed to demonstrate how the permitting process advances its compelling interests."), *with id.* at 34 ("The government did build a record in the district court with respect to Mr. Saenz.  Therefore, we examine the record to determine if the government has carried its burden of proving the least restrictive means of carrying out its interests."), *id.* at 35 ("We move on, then, to the question of whether the government has met its burden of proving that the permitting scheme is the least restrictive means of advancing its compelling interests."), *and id.* at 36 ("We therefore find that, on the record presented in <u>Saenz</u>, the government has failed to show that limiting permits for eagle feathers only to members of federally recognized tribes is the least restrictive means of advancing the government's interests in preserving eagle populations and protecting Native American cultures.").

permitting process advances the government's interest in protecting eagles. *See id.* at 36-38. This conclusion is not at all surprising, nor is it even remotely relevant. By the end of its opinion, the majority seems to have forgotten that the permitting process set out at 50 C.F.R. § 22.22 is part of a broader regulatory scheme—BGEPA, MBTA, and their shared regulations—designed to further two compelling yet competing interests. *See* Majority Op. at 12-16 (setting out as background entire regulatory scheme); *United States v. Dion*, 476 U.S. 734, 743-44 (1986) ("Congress . . . considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow exception . . . ."). In furtherance of one of those compelling interests, the interest in protecting eagles, the regulatory scheme prohibits the possession of eagles and eagle parts. *See* 16 U.S.C. § 703; *id.* § 668. In furtherance of the competing interest, the interest in preserving Native American culture, the regulatory scheme empowers the Secretary of the Interior to allow possession of eagles and eagle parts for the "religious purposes of Indian tribes." *Id.* § 668a; *see also id.* § 704. Accordingly, the relevant question is whether the *entire* regulatory scheme as a whole, not just one selected portion of it, advances the government's compelling interest in the preservation of eagles. There can be absolutely no question that the general prohibition on the taking or possession of eagles or eagle parts advances the government's interest in the

-4-

preservation of eagles.

The majority's determination that the regulatory scheme does not advance the government's interest in protecting Native American culture is equally flawed. The majority "consider[s] to what degree excluding non-tribal members from the permitting scheme advances the government's interest in preserving Native American cultures and fulfilling trust obligations" and ultimately concludes that "[t]he government has failed to demonstrate how the permitting process advances its compelling interests." Majority Op. 39, 41. As set forth below, the majority's analysis of this claim improperly mixes two separate questions. Furthermore, the majority is simply incorrect in concluding that the regulatory scheme does not advance the government's interest in protecting Native American culture.

First, although the majority purports to analyze whether the permitting process furthers the government's interests in protecting Native American culture, the bulk of the majority's discussion in Section II.F.2.b. is actually directed to the analytically distinct question of whether the permitting process is the least restrictive means of advancing that interest. For instance, the majority concludes that the government has failed to carry its burden of demonstrating that "broader eligibility would result in an increased wait substantial enough to endanger Native American cultures." Majority Op. at 40. Although I agree with this statement and would thus affirm the district court in *Saenz* on the ground that the

-5-

government failed to carry its burden of proving that the regulatory scheme is the least restrictive means of setting its compelling yet competing interests in equipoise, *see infra*, I fail to see how this evidentiary deficiency relates to the question whether the regulatory scheme advances the government's interest in protecting Native American culture. *At this stage of the analysis*, the question is not whether a less restrictive regulatory scheme would advance the government's interest; the question is whether the current regulatory scheme does advance those interests.

Second, in contrast to the conclusion reached by the majority, the regulatory exception as implemented through the permitting process most surely advances the government's interest in protecting Native American culture. Without the exception, Native Americans would fall under the general prohibition against the possession of eagles and eagle parts. Without access to eagles and eagle parts, Native Americans could not engage in their traditional way of life. Accordingly, the permitting process, which allows Native Americans to access sacred items that they would otherwise be banned from possessing, advances the government's interest in protecting Native American culture.[3]

---

[3]It is unclear from the majority opinion exactly what are the contours of the government's compelling interest in protecting Native American culture. The majority intimates that the interest can be limited to the maintenance of the viability of Native American cultural practices as a historical legacy within the

(continued...)

Because it is absolutely clear the regulatory scheme advances the

[3](...continued)

contours of our modern culture. *See* Majority Op. at 40 ("Moreover, the government offers no evidence on the threshold question of whether allowing sincere practitioners who are not members of federally recognized tribes to possess eagle feathers, in addition to those who are members, truly threatens Native American culture. Allowing a wider variety of people to participate in Native American religion could just as easily <u>foster</u> Native American culture and religion by exposing it to a wider array of persons."). If that were truly the nature of the government's compelling interest, however, I cannot imagine what evidence the government could produce on remand in *Hardman* and *Wilgus* to demonstrate that the current regulatory scheme is the least restrictive means of balancing its compelling yet competing interests. Under this view, the government's interest in protecting Native American culture would be furthered to the exact same extent if the available supply of eagle parts were distributed equally to all adherents of relevant Native American religions, without regard to whether the adherents were, in fact, Native Americans.

I see the contours of the government's compelling interest a little differently: guaranteeing members of sovereign and semi-autonomous Indian nations the ability to carry on their traditional way of life. Accordingly, the government's task on remand is to adduce evidence, if possible, demonstrating that any further delay in the provision of eagle parts and feathers occasioned through expanding the pool of eligibility would hinder the ability of Native Americans to engage in their traditional way of life.

Despite the language from the majority opinion quoted above, the majority disclaims expressing any opinion "on whether distributing eagle feathers to sincere adherents of Native American faiths irrespective of whether they were members of federally recognized tribes or not, or of Native American lineage or not, would foster or inhibit" the government's compelling interest. *Id.* at 40 n.23. It also disclaims any suggestion that it takes "too cramped a view" of the government's compelling interest. *Id.* If, however, the government's compelling interest lies in guaranteeing that members of sovereign and semi-autonomous Indian nations have the ability to carry on their traditional ways of life, I fail to see how distributing eagle feathers outside of that class could ever "<u>foster</u>" the government's interest. This is an entirely different question, however, from whether the government could further its competing interests in a less restrictive manner. Unfortunately, footnote 23 of the majority opinion fails to clarify the nature of the government's compelling interest.

government's dueling interests in preserving eagles and protecting Native American culture, it is necessary to proceed to RFRA's least-restrictive-means requirement. As noted above, the rather unique regulatory scheme at issue in this case is an effort to accommodate two compelling yet competing interests. It would therefore seem that the relevant question is whether the scheme is the least restrictive means to further the government's interest in setting those interests in equipoise. Indeed, the First Circuit has described this regulatory scheme, albeit in the context of an Establishment Clause challenge, as follows:

> The exemption, therefore, does not merely *serve* the government's interests in (1) protecting Native American religion and culture and (2) protecting a dwindling and precious eagle population; it sets those interests in equipoise. Any diminution of the exemption would adversely affect the former interest, but any extension of it would adversely affect the latter. In equal protection terms, the "fit" between classification and legislative purpose is snug; indeed, given the nature of the governmental interests at stake and the close fit between the exemption and those interests, we would be hard put to say that the exemption could not survive even "strict scrutiny."

*Rupert v. Dir., United States Fish & Wildlife Serv.*, 957 F.2d 32, 35-36 (1st Cir. 1992).

For this exact reason, any analysis of whether the regulatory scheme is the least restrictive means of advancing either compelling interest, when considered in isolation, necessarily leads to the conclusion that the regulatory scheme conflicts with RFRA. If, for instance, the regulatory scheme is measured solely against the government's interest in protecting eagles, it is clear that the scheme

-8-

is not the least restrictive means of advancing that interest. In that scenario, distributing the available parts and feathers from dead eagles to all individuals with a sincere religious need for the items is a less restrictive, but equally effective, means of protecting eagle populations. If, on the other hand, the regulatory scheme is measured solely against the government's interest in protecting Native American culture, that interest can be furthered in a less restrictive way by increasing the supply of eagle parts through the hunting of eagles. This analytical approach, although certainly easy to conceptualize and apply, fails to truly capture the essence of the government's interest in setting dueling compelling interests in equipoise.

Accordingly, it is not relevant to this court's resolution of *Saenz* that the government failed to show "that statutory protections for eagles (apart from the exception for religious purposes) were motivated by trust obligations." Majority Op. at 41. It is clear that the statutory protections afforded eagles are not in any way related to the government's compelling interest in protecting Native American culture. Instead, the statutory prohibition is designed to protect the viability of the species and the exception for Native American religious practices is an attempt to reconcile the interest in eagle conservation with the interest in preserving Native American culture. Unfortunately, the statements from the majority opinion cited above, although made in the context of its apparent

resolution of this case at the antecedent step of whether the regulatory scheme advances the government's interests at all, diminish the magnitude of the government's interests and, more importantly, misdirect the district court as to its task on remand in *Hardman* and *Wilgus*.

The majority correctly opines that each of the interests advanced by the government is compelling and that the record is simply too sparse to engage in any meaningful analysis of Hardman's and Wilgus' RFRA claims. Although I agree that the district court appropriately sustained Saenz's RFRA claim, I reach that conclusion on a basis significantly different than that of the majority. Although I would conclude the record clearly demonstrates that the regulatory scheme advances each of the government's compelling yet competing interests, the government has failed to demonstrate that the scheme is the least restrictive means of placing its dueling interests in equipoise. In particular, the record on appeal is so sparse that it is impossible to determine whether expanding eligibility for eagles and eagle parts would compromise the government's interest in protecting Native American culture. Unless the government can present evidence demonstrating that the answer to this question is affirmative, the regulatory scheme is not the least restrictive means of setting the government's interests in equipoise. Accordingly, the extraordinary task for the district court on remand in *Hardman* and *Wilgus* is to determine, on a proper evidentiary record, whether

there is any possible scheme which places the government's interests in equipoise in a less restrictive manner, *i.e.*, places the interests in equipoise while, at the same time, providing eagle parts to sincere believers who are not members of a federally recognized tribe.

**HARTZ**, Circuit Judge, concurring:

I join Chief Judge Tacha's opinion for the court. I write separately to emphasize what we are not deciding.

The issue raised by these appeals is whether the claimants were entitled under RFRA to permits to possess the eagle parts they had obtained. Each claimant has challenged the regulatory scheme created by the general ban on possession of eagle parts imposed by 16 U.S.C. §§ 668 and 703 and the exceptions to the general ban authorized by 16 U.S.C. §§ 668a and 704.

The issue *not* raised by these appeals is whether the procedures for distributing eagle parts from the National Eagle Repository are contrary to RFRA. These procedures had no effect on the conduct of the claimants before us. The records in these cases indicate that the claimants obtained their eagle parts as gifts from Native Americans. Nothing suggests that the unavailability of eagle parts from the Repository caused any of the claimants to search actively for an alternate source, causing the claimant to acquire the parts in the manner that he did. *Cf. United States v. Oliver*, 255 F.3d 588 (8th Cir. 2001) (per curiam) (defendant claimed that delays in obtaining eagle parts from the Repository led him to obtain the parts illegally). Hardman sought a permit from a Utah agency to possess his feathers; he did not seek Repository feathers. As I understand the arguments of

the claimants on appeal, they are simply asserting that the government has no compelling interest in preventing them from continuing to possess their eagle parts for religious purposes; in other words, they should be entitled to permits to possess the parts. They have not argued, and, on the facts of these cases, they have no reason to argue, that they are entitled to eagle parts acquired by the Repository.

It is important to state what we are not deciding because the briefs and arguments have expressed concern about the possible impact of our decision on the ability of tribes to obtain eagle parts for religious purposes from the Repository. That impact will be negligible, if not nonexistent. As I will now attempt to explain, the issues on remand in the Hardman and Wilgus cases are quite different from the issues that would have to be decided on a RFRA challenge to the practices of the Repository.

1.    Issues on Remand

As Chief Judge Tacha's opinion states, the protection of golden eagles and bald eagles is a "compelling governmental interest" within the meaning of the term in RFRA. The government is entitled to take steps necessary to prevent humans from killing these birds. It is my understanding that under the present operation of the regulations, no killing is permitted for any reason, religious or otherwise. For example, if eagles are preying on livestock, permits are not issued

to kill the eagles but only to capture them and then provide them to falconers or Indian tribes.

The chief question under RFRA is whether the governmental controls on possession of eagle parts are more restrictive than necessary to accomplish the purpose of protecting eagles. Or, to use the statutory language, are the governmental controls "the least restrictive means of furthering [the] compelling governmental interest" of protecting eagles? 42 U.S.C. § 2000bb-1(b)(2). In the context of the present cases, the matter to be resolved is whether protecting eagles requires a ban on possession of eagle parts by those who need the parts for religious worship but are not members of recognized tribes. (I shall refer to such persons as "worshippers.") In my view, the government's practice of permitting members of recognized tribes to possess eagle parts is largely irrelevant to the analysis. That practice is certainly relevant to an Establishment Clause or equal protection argument, but we do not address those issues in this appeal.

The government's burden would be as follows: First, the government must establish the necessity of a general ban on possession of eagle parts, rather than just a prohibition on killing or capturing eagles. I assume that the government will be able to satisfy that burden by showing that it is ordinarily impossible for an inspection to determine whether an eagle feather or other eagle part has come from a bird that died naturally or as a result of illegal hunting (by shooting,

poisoning, trapping, etc.).

The government must then show that any exceptions beyond the ones already recognized would be unworkable. This strikes me as a more difficult obstacle for the government. It may be possible for a possessor of eagle parts to provide convincing proof that the parts came from a legitimate source. For example, a tribal religious leader who obtains eagle feathers from the Repository can readily establish the propriety of possessing those feathers. Or if (as may well be the case with Hardman and Wilgus) the possessor can convincingly prove that he obtained eagle feathers from a source that acquired the feathers from the Repository or from eagles that died before the effective date of the statutory protection for eagles,[1] then protection of eagles would not justify prohibiting the possession.

A ban on possession of eagle parts is not the least restrictive means of furthering the compelling interest in protecting eagles if it is feasible to allow worshippers to present convincing proof of the legitimate source of the parts they possess. The government may wish to ease its burden of reviewing evidence in such cases by instituting a scheme to keep track of lawful eagle parts (say, by

---

[1]No permit is required to possess parts of bald eagles lawfully acquired before June 8, 1940, 50 C.F.R. § 22.2(a)(1)(i), or parts of golden eagles lawfully acquired before October 24, 1962, 50 C.F.R. § 22.2(a)(1)(ii). It is not clear what kind of proof is required for a possessor of eagle parts to qualify for one of these exceptions to the general permit requirement.

registration); but for the present, the government would have the burden under RFRA to show that there is no satisfactory means of reviewing evidence of the provenance of eagle parts.

If the government fails to establish that it would be unworkable to recognize an exception for worshippers who can trace their eagle parts to a lawful source, the government would still have a fallback position. At the outset of this discussion I stated that the government's practice of authorizing possession of eagle parts by recognized tribes is largely irrelevant. But there is one respect in which the interests of recognized tribes may have an impact. As noted in Chief Judge Tacha's opinion, the federal government has compelling interests in meeting its trust and treaty obligations to Indian tribes and in preserving Native American culture. If the government is able to prove that it cannot properly serve those interests without seizing privately possessed eagle parts (regardless of whether the possessor can establish a proper source) and distributing them to recognized tribes, then it may have satisfied RFRA's least-restrictive-means requirement.

These issues to be resolved on remand in the Hardman and Wilgus cases are distinct from the issue whether RFRA invalidates the government's scheme for distributing dead eagles and eagle parts from the Repository. The latter issue raises quite different legal questions from those briefed and argued in this court.

2.    RFRA and the National Eagle Repository

Recognized tribes may now obtain golden eagle and bald eagle parts for religious purposes from the National Eagle Repository in Commerce City, Colorado. The Repository is not mentioned in the United States Code or the Code of Federal Regulations. Its operations are not part of the statutory or regulatory scheme at issue in the cases before us, although I presume that the Repository would provide feathers only to those with proper permits. According to the testimony at the Saenz hearing, the sources for the Repository include zoos and carcasses found by field biologists, state fish and game officials, and federal employees. A 1994 Presidential Memorandum "direct[ed] each agency responsible for managing Federal lands to diligently and expeditiously recover salvageable eagles found on lands under their jurisdiction and ensure that the eagles are promptly shipped to the National Eagle Repository." 59 Fed. Reg. 22953. I assume that eagle parts seized from unlawful possessors are also delivered to the Repository.

Before examining how RFRA may apply to the operation of the Repository, it is important to recognize the peculiar relationship of the statute to Supreme Court case law on the Free Exercise Clause. As noted by the Chief Judge's opinion, RFRA was a congressional reaction to *Employment Division v. Smith*, 494 U.S. 872 (1990). The expressed purposes of RFRA are:

>(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
>(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b). One can thus conclude that pre-*Smith* Supreme Court opinions that purport to be consistent with *Sherbert* and *Yoder* are persuasive authority with respect to the interpretation of RFRA.

The first question that arises with respect to the application of RFRA to the operation of the Repository is whether that operation imposes a burden on the exercise of religion. The general rule expressed in RFRA is that "Government shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). "[E]xercise of religion" is defined in the statute as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4).

One may ask how the distribution of the Repository's eagle parts to Indian tribes (or to anyone else, for that matter) burdens someone else's exercise of religion. Some illumination may be found in the Supreme Court's observation that "'the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S.

439, 451 (1988) (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)). Because the operation of the Repository does not do anything <u>to</u> a person who might wish to possess some of the Repository's inventory, the inability of the person to exact eagle parts from the Repository would appear to raise no Free Exercise issue.

In *Lyng* the Supreme Court upheld against a Free Exercise challenge the government's building of a road and harvesting of timber on public land even though these actions "could have devastating effects on traditional Indian religious practices." *Id*. at 451. The *Lyng* decision predates *Employment Division v. Smith*. Although *Lyng* has been criticized, *see, e.g.*, Ira C. Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion*, 102 Harv. L. Rev. 933 (1989), RFRA does not purport to affect the law set forth in that opinion. *See* S. Rep. No. 103-111 (1993), *reprinted in* U.S.C.C.A.N. 1892, 1898 ("while the committee expresses neither approval nor disapproval of that case law, pre-*Smith* case law makes it clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources [citing *Lyng* and *Bowen v. Roy*, 476 U.S. 693 (1986)]"). Given *Lyng's* impact on the religious practices of Native American tribes, it would be ironic if the principle on which that decision is based were not available to the tribes in defending the present system of

distributing eagle parts from the Repository. Tribal support for the government's position in these cases is expressed in the amicus curiae briefs filed by the Hopi Tribe and the Jicarilla Apache Nation in this consolidated appeal and in the Ute Tribe's amicus curiae brief in the original Hardman appeal.

If RFRA does not limit the government's power to control its own property, the government's distribution of eagle parts from the Repository is not in itself constrained by RFRA. Certainly, if there were no government restrictions on private possession of eagle feathers, I do not think it could be argued that a worshipper would have a claim under RFRA on the Repository's store of feathers.[2] (This is not to foreclose an argument that distributing the Repository's feathers only to recognized tribes would constitute an establishment of religion or would be a denial of equal protection of the laws.)

Of course, my assumption in the prior paragraph assumes away the difficulty in this case. Contrary to that assumption, the government prohibits private possession of eagle parts. Nevertheless, I doubt that even the juxtaposition of (1) a government ban on possession and (2) a government

---

[2]RFRA includes the sentence: "Granting government funding, benefits, or exemptions to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter." 42 U.S.C. § 2000bb-4. I am not sure whether this provision has relevance to the present case. *See* Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 238-39 (1994) [hereafter Laycock & Thomas].

repository of eagle parts creates a claim that failure to share parts from the Repository with worshippers burdens their exercise of religion, although perhaps a worshipper could claim that the Repository burdens the worshipper's exercise of religion if the Repository acquired eagle parts taken from the worshipper or taken from lands on which the worshipper has exclusive hunting rights.

Yet even if the operation of the Repository does not burden a worshipper's exercise of religion, RFRA may still have an impact on the Repository. The prohibition on possession of eagle parts is undoubtedly a burden on religious exercise. RFRA requires that any such burden must be "the least restrictive means of furthering [the] compelling governmental interest" that justifies the burden. 42 U.S.C. § 2000bb-1(b)(2). Thus, the second question that arises in evaluating RFRA's impact on the Repository is whether access by a worshipper to the Repository's eagle parts is necessary to satisfy RFRA's requirement that the government employ the least restrictive means in furthering its compelling interests.

There is very little guidance available on the meaning of "least restrictive means" in RFRA. The phrase is not defined in the statute or expounded upon in the Committee reports. The Supreme Court's Free Exercise cases do not discuss the meaning. *See City of Boerne v. Flores*, 521 U.S. 507, 535 (1997) (asserting that pre-*Smith* jurisprudence did not use a least-restrictive-means requirement).

*But see Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) (stating least-restrictive-means requirement in dictum). After analyzing RFRA's compelling-governmental-interest and least-restrictive-means requirements, one commentary concluded that these provisions are "ambiguous in very basic ways," leading to "a dizzying collection of possibilities about [their] meaning." Ira C. Lupu, *Of Time and the RFRA: A Lawyer's Guide to the Religious Freedom Restoration Act*, 56 Mont. L. Rev. 171, 197 (1995). Another article devotes its attention primarily to other language in RFRA, *see* Laycock & Thomas, *supra*, at 221, and limits its discussion of "least restrictive means" to saying that the government must show "that an exception for religious claimants would defeat [the government's] compelling interest." *Id.* at 222; *cf. id.* at 224 (quoting similar tests expressed in Supreme Court opinions).

Perhaps RFRA's least-restrictive-means test is intended only as a paraphrase of the test stated in one of the two Supreme Court opinions embraced in RFRA's statement of purpose. In *Sherbert v. Verner*, the Court wrote that the government must "demonstrate that no alternative forms of regulation would [accomplish the governmental interest] without infringing First Amendment rights." 374 U.S. at 407. In other words, "least restrictive means," as one would naturally interpret the phrase, signifies that the imposition by the government on religious worship must be the minimal imposition to accomplish the government's

compelling ends.  This appears to be the view expressed in Laycock & Thomas, *supra*, at 222.

To hold that the least-restrictive-means requirement provides worshippers with a right of access to Repository eagle parts would be a substantial expansion beyond this interpretation of the requirement.  There is a qualitative difference between (1) requiring the government to impose as little burden as possible and (2) requiring the government to expend resources to offset the loss caused by the necessary government imposition.  One difficulty with an offset requirement is determining how far the government must go in providing an offset.  With respect to a claim for access to Repository eagle parts, one can ask whether there is any limiting principle applicable to the claim, short of requiring an immediate grant of requested eagle parts to a worshipper.  How much can be required of the government to supply eagle parts to worshippers who are prohibited from obtaining them on their own?  Was the 1994 Presidential Memorandum (which directed an all-out effort to obtain eagle parts) compelled by RFRA?  Does the government have an obligation under RFRA to obtain eagle parts from foreign sources? Or, reversing directions, does the government have any obligation at all under RFRA to maintain a repository or to require its agents to look for eagle carcasses on government land?  Retreating to a middle ground, does one just take as given the quantity of eagle parts that the government has on hand and then

require that the quantity, whatever it is, be available, in part, to worshippers?  As for this last possibility, RFRA's least-restrictive-means requirement would create a peculiar "right" if the government has total discretion regarding how much to honor it by deciding how much, if any, effort to put into a repository.

No Supreme Court decision requires the government to expend resources to offset (as opposed to reduce) a permissible burden on an individual's exercise of religion.  For example, when the Supreme Court upheld Sunday closing laws against a Free Exercise challenge, despite the financial burden on business owners who close shop on Saturday to observe their Sabbath, *Braunfeld v. Brown*, 366 U.S. 599 (1961), there was no discussion of whether the government must pay such persons to offset the income lost by having to close two days a week when competitors close shop only on Sunday.

Some Supreme Court Free Exercise cases that might, at first glance, appear to require a government offset are the unemployment compensation cases, such as *Sherbert*.  In those cases the government has been required to pay unemployment compensation to one who loses or quits a job for religious reasons, such as refusal to work on the Sabbath.  But such compensation is not an offset to a burden imposed on the recipient by the government; the government did not fire the recipient or order the recipient to work on the Sabbath.  Rather, the Supreme Court has required compensation because to refuse to pay would be the equivalent

of imposing a fine on the recipient for obeying a religious command. *Sherbert*, 374 U.S. at 404. *Sherbert* is properly viewed as simply prohibiting denial of a generally available benefit on the ground that the person refused to engage in certain conduct when that conduct would "violate a cardinal principle of her religious faith." *Id.* at 406. In contrast, eagle parts from the National Eagle Repository are not generally available, and a worshipper is not being denied eagle parts because of her religious beliefs.

On the other hand, the Supreme Court has at least hinted that the Free Exercise Clause may require prisons to provide clergy for inmates, *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (per curiam). And some authorities have suggested that the Free Exercise Clause requires the armed forces to provide clergy for military personnel who could not otherwise attend religious services. *E.g.*, *Katcoff v. Marsh*, 755 F.2d 223, 234 (2d Cir. 1985). *Cf. Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) (requiring prison to provide free kosher meals). Providing clergy for soldiers or prisoners could be viewed as an offset to the deprivation of the right of free exercise resulting from necessary constraints on freedom of movement. But the subject remains unexplored by the Supreme Court.

I raise these issues not to resolve them, but to stress that they are not resolved by this court today. We need not, should not, and do not decide in these cases whether RFRA invalidates in any way the operation of the National Eagle

Repository.  That interesting issue must await full briefing and argument in a proper case.